**Milton MARGOLES, M.D., Appellant,**

v.

**Alida JOHNS et al.**

**No. 72–1059.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 19, 1972.

Decided June 15, 1973.

William H. Seckinger, Washington, D. C., with whom John P. Diuguid, Rockville, Md., was on the brief, for appellant.

Roberts B. Owen, Washington, D. C., with whom William Iverson, Washington, D. C., was on the brief, for appellees.

Before BAZELON, Chief Judge, and TAMM and LEVENTHAL, Circuit Judges.

TAMM, Circuit Judge:

On August 19, 1971, appellant, Dr. Milton Margoles, filed a two count complaint in the federal district court seeking relief for alleged slanderous utterances made by Alida Johns, an employee of The Journal Company of Milwaukee, Wisconsin [hereinafter "The Journal"], naming both Alida Johns and The Journal as defendants. The district court on November 18, 1971, granted the defendants' motions to dismiss the action and quash service of process for failure to effect proper in personam jurisdiction. Margoles v. Johns, 333 F.Supp. 942 (D. D.C.1971). This appeal is taken from that order, and we affirm.

I

Appellant's complaint alleged that on August 20 and September 2, 1970, Alida Johns telephoned, from her Wisconsin office with The Journal (publisher of the *Milwaukee Sentinel* and *Milwaukee Journal*), employees of an Illinois Congressman[1] at the Congressman's office in the District of Columbia and "maliciously spoke of and concerning" the appellant with false and defamatory words. These defamatory words consisted of allegations that the doctor was guilty of "abortion charges," that he ran a "house of ill-fame," that he was "unfit for help by decent people," that everyone "knew his hospital was an abortion mill," and finally that if given a license in Illinois the doctor would still have a hand in his "abortion mill" in Wisconsin. The complaint further stated that at all times pertinent to this action Alida Johns was an agent and employee of The Journal and was acting for The Journal within the scope of her employment. The complaint additionally alleged that The Journal failed to correct or control Alida Johns' actions, and asked for relief consonant with the "great pain and mental anguish" Dr. Margoles suffered, *i. e.*, a total of one million dollars in compensatory and punitive damages.

The defendants filed no answer, but severally filed motions to dismiss under Fed.R.Civ.P. 12(b) for lack of jurisdiction over the person, insufficiency of process, and improper venue.

In the Memorandum filed with the Order granting defendants' motions the

---

1. It is not clear from the record before us, but we assume that the calls were made in an effort to enlist aid in preventing Dr. Margoles from becoming licensed in Illinois.

district judge properly inferred from the plaintiff's uncontested allegations of publication that the injury to the plaintiff's reputation, if any, occurred in the District of Columbia. That alone, however, was not recognized as affording personal jurisdiction, for "[t]he statute [2] clearly separates the act from the tortious injury and affords personal jurisdiction over non-residents only when both act and injury occur in the District." 333 F.Supp. at 944–945 (footnote omitted). Finding that the act in question was performed in Wisconsin, the service of process on Alida Johns was quashed. The court found that the activities of The Journal might ordinarily render it amenable to suit under another section of the jurisdiction statute,[3] but nonetheless felt compelled to quash service of process as to The Journal, stating that "[i]t has long been settled that a foreign newspaper corporation maintaining an office and news correspondents in the District of Columbia for the gathering of news is not 'doing business' for the purpose of service of process . . . ." 333 F.Supp. at 946. *See* Bulletin Co. v. Origoni, 128 U.S.App.D.C. 282, 387 F.2d 240, cert. denied, 389 U.S. 928, 88 S.Ct. 287, 19 L. Ed.2d 278 (1967).

## II

*1. Legislation and Legislative History*

When the District of Columbia Court Reform and Criminal Procedure Act of 1970 [4] generally became effective on February 1, 1971, the local courts were afforded a long-arm statute of "moderate reach." *See* 4 C. Wright and A. Miller, Federal Practice and Procedure § 1068 (1969). Section 132(a) of the Act added a chapter 4 to title 13 of the District of Columbia Code,[5] providing in pertinent part:

(a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's—

(1) transacting any business in the District of Columbia;

\* \* \* \* \* \*

(3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;

(4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia;

\* \* \* \* \* \*

(b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.

13 D.C.Code § 423 (Supp. V, 1972). Appellant seeks to assert in personam jurisdiction over appellee Johns by virtue of section (a)(3) and over appellee The Journal by virtue of sections (a)(3) or (a)(4).

The legislative history concerning this portion of the Court Reform Act is, at best, meager, for it consists almost entirely of two short references in the respective House and Senate committee reports. The Senate Committee on the District of Columbia reported:

A new chapter (4) is added, incorporating a modified version of the first

---

2. *See* 13 D.C.Code § 423(a)(3) (Supp. V, 1972).

3. *See* 13 D.C.Code § 423(a)(4) (Supp. V, 1972).

4. Act of July 29, 1970, Pub.L. No. 91–358, 84 Stat. 473.

5. Pub.L. No. 91–358, § 132(a), 84 Stat. 548, amending 13 D.C.Code (1967) (codified at 13 D.C.Code §§ 421–25 (Supp. V, 1972)).

two articles of the Uniform Interstate and International Procedure Act. The uniform provisions codify recent case law with respect to extraterritorial jurisdiction over and service upon persons in civil litigation, and supply the reorganized trial bench of general jurisdiction with a necessary procedural adjunct. Chapter 4 more specifically grants expanded bases of jurisdiction and modes of service identical to or reciprocal with those provided under the laws of the nearby State of Maryland for the courts of that State, and substantially the same as those provided in the adjacent State of Virginia and approximately 10 other States.

S.Rep.No.405, 91st Cong., 1st Sess. 35 (1969). Similarly, the House Committee on the District of Columbia reported: [6]

> Section 132 on civil jurisdiction and service outside the District of Columbia is modeled on the Uniform Interstate and International Procedure Act, more specifically grants expanded bases of jurisdiction and modes of service identical to or reciprocal with those provided under the laws of the nearby State of Maryland for the courts of that State, and substantially the same as those provided in the adjacent

State of Virginia and approximately ten other States.

H.R.Rep.No.907, 91st Cong., 2d Sess. 61 (1970).

Section (a)(3) of the District's long-arm statute is in fact more restrictive than that of the Uniform Interstate and International Procedure Act [hereinafter "Uniform Act"], for the latter does not restrict jurisdiction to instances where the tortious injury occurs within the forum state. In all other respects the two acts are identical. At the effective date of the Court Reform Act Virginia's long-arm statute, Va.Code Ann. § 8–81.2 (Cum.Supp.1972), was identical to that of the Uniform Act with the exception of one section not here relevant, and Maryland's statute, Md.Code Ann. Art. 75, § 96 (Cum.Supp.1972), was identical to that of the Court Reform Act with the exception of section (a)(4), which replaced "goods used or consumed, or services rendered" with "goods, food, services or manufactured products used or consumed." [7]

If anything can be ascertained from the history it must be that Congress' overall intent was to provide the District's courts, to the greatest extent possible, with essentially identical long-

---

6. Mr. George E. Monk, then president of the District of Columbia Bar Association, testified as follows in the Hearings before Subcomm. Nos. 1 and 3 of the House Comm. on the District of Columbia, 91st Cong., 1st Sess., 158–59 (October 7, 1969):

> The Association invites your attention to an important provision in Title II, relating to Judicial Procedure, as S. 2601 passed the Senate. I refer to Subsection (6) of Section 202 of that Bill, which provides a new Chapter 4 to Title 13 of the D.C.Code with respect to civil jurisdiction and service outside the District of Columbia. This new Chapter 4 contains a modified version of the first two articles of the Uniform Interstate and International Procedure Act—the so-called "Uniform Long-Arm Statute". . . .
>
> More and more states are finding it necessary to enact long-arm laws of one type or another, some of them—

for example, Arkansas, Massachusetts, Michigan, Nebraska, Oklahoma and the Virgin Islands—in the form of the Uniform Act, and some of them as variations of that act. I understand that 40 or more states have passed long-arm laws of one kind or another, including both our neighboring jurisdictions, the States of Maryland and Virginia.

> The provisions of S. 2601 on the subject compare very closely to the provisions of the Maryland Law, as well as to the provisions of the Virginia Law . . . .

7. Effective July 1, 1971, Maryland amended § 96(a)(4) to provide personal jurisdiction as to a cause of action arising from "[c]ausing tortious injury in this State *or outside of this State* by an act or omission outside the State" so long as minimal contacts with the state are present. Acts of Maryland 1971, ch. 769, § 1 (emphasis added).

arm jurisdiction as was then available in Maryland and Virginia. Obviously the geographical proximity of those jurisdictions and the constant flux caused by the transpontination of their residents rendered action such as that taken by Congress both wise and necessary. Little more can be discerned, and we thus must look to the background of the Uniform Act itself for guidance, at all times tempering our inclinations with the realization that Congress sought to attain uniformity in the area's three primary jurisdictions.

*2. The Predominant Long-Arm Statutes*

Three formulations of the various long-arm statutes currently in force predominate: (1) Statutes which predicate jurisdiction over a non-resident upon either a "tortious act" or "tortious conduct" occurring within the state. *See, e. g.*, Ill.Rev.Stat.1971, ch. 110, § 17(1)(b). This type of statute has been subject to varying interpretations, *compare* Fayette v. Volkswagen of America, Inc., 273 F.Supp. 323 (W.D.Tenn.1967), with Tate v. Renault, Inc., 278 F.Supp. 457 (E.D. Tenn.1967), aff'd, 402 F.2d 795 (6th Cir. 1968), but is generally given broad construction—essentially limited only by due process considerations—which may include vesting jurisdiction when the only contact with the state is the injurious consequence of an act or omission committed elsewhere. *See* Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961), *and* Annot., 24 A.L.R.3d 532, 563–567 (1969). (2) Statutes which predicate jurisdiction over a non-resident upon the commission of "a tort in whole or in part" within the jurisdiction. *See, e. g.*, Vernon's Texas Ann. Civ.St. art. 2031b, § 4 (1964). In general, these too are broadly construed. *See* Hearne v. Dow-Badische Chemical Co., 224 F.Supp. 90 (S.D.Tex.1963). (3) Statutes which substantially adopt the Uniform Act and separate "act" from "injury," granting jurisdiction

over non-residents who by their out-of-state acts or omissions cause tortious injury within the state only where additional minimum contacts with the state are also present. *See, e. g.*, 13 D.C.Code § 423 (Supp. V, 1972), Va.Code Ann. § 8–81.2 (Cum.Supp.1972), *and* Md.Code Ann. Art. 75, § 96 (Cum.Supp.1972).

The Commissioners' Note filed with the Uniform Act, 9B Uniform Laws Annot. 310 (1966), specifically points out the limitations imposed by the Uniform Act:

> Section [(a)(3)] may have a narrower range of application than statutes which base jurisdiction upon the "commission of a tortious act" within the state, or upon the commission of a tort "in whole or in part" in the state. Some of these statutes have been interpreted to cover acts or omissions outside the state. . . .
>
> Section [(a)(4)] authorizes the exercise of jurisdiction when the tortious act or omission takes place without the state but the injury occurs within the state and there is some other reasonable connection between the state and the defendant. . . . The rule is more restrictive than the Illinois statutes, as interpreted in Gray v. American Radiator & Standard Sanitary Corp., and the Michigan statute. (Citations omitted.)

*Id.* at 312. The formula of the Uniform Act, drawing back as it does from the limits set by such expansive opinions as *Gray*, "was presumably devised to obviate any possible due process objections." Beaty v. M. S. Steel Co., 401 F. 2d 157, 159 (4th Cir. 1968), cert. denied, 393 U.S. 1049, 89 S.Ct. 686, 21 L.Ed.2d 691 (1969) (footnote omitted). Maryland and Virginia courts have uniformly observed the limits set by their respective statutes, and reject jurisdiction where the only contact with the state is the injurious consequence of an out-of-state act or omission, be that intentional, *see* St. Clair v. Righter, 250 F.Supp. 148 (W.D.Va.1966),[8] or negligent, *see*

---

8. In *St. Clair*, however, the court went on to find that it was not limited by the

statute, but could assert jurisdiction *sua sponte* to the limits of the due process

Haynes v. James H. Carr, Inc., 427 F.2d 700 (4th Cir.), cert. denied, 400 U.S. 942, 91 S.Ct. 238, 27 L.Ed.2d 245 (1970); Beaty v. M. S Steel Co, *supra;* and Vitro Electronics v. Milgray Electronics, Inc., 255 Md. 498, 258 A.2d 749 (1969).

Circuit Judge Sobeloff, writing in *Beaty,* discussed the Uniform Act and its relationship to the "tortious act" statutes:

> In *Gray,* the Illinois court interpreted that state's long-arm statute to cover a non-resident defendant who had no connection with Illinois except that it had acted negligently out of state, causing injury in the state. The Illinois statute provided that in personam jurisdiction may be asserted over any person who "commits a tortious act" within the state. It was with knowledge of the *Gray* resolution of the ambiguity inherent in the phrase "tortious act" that the draftsmen of the Uniform Act . . . explicitly differentiated between in-state and out-of-state conduct. . . . This formula was presumably devised to obviate any possible due process objections.

401 F.2d at 159 (footnote omitted).

### III

■ Appellant bases jurisdiction under section (a)(3), although admittedly appellee Johns made the telephone call from the state of Wisconsin, upon an assertion that Johns should be considered as "project[ing] her presence" into the District and consequently as acting therein within the meaning of section (a)(3). We cannot accept such reasoning. Were we to develop any such "presence" doctrine we would be thwarting the plain language and normal interpretation of the District's statute, and creating needless ambiguities which have no place in a statute as reasonably constructed as the Uniform Act.

■ Certainly, at minimum two actions are necessary for the tort of slander—one individual must act in speaking the words of defamation while another must act in hearing them to the injury of a third party. This is no different from almost any tort, however, for more than one action is nearly always necessary to give rise to a cause of action. In products liability, for instance, there generally is the act of negligent fabrication on the part of the tortfeasor followed by assorted acts of sale, distribution, even installation, concluded by the ultimate act of use which precipitates the injury. Injury itself is an important element of a tort, not something to be considered separate and distinct. Those courts which have found that the injurious consequences of an act consummated elsewhere vest jurisdiction under "tortious act" or "tort in whole or in part" statutes explicitly recognize the elemental, not merely remedial, aspects of injury.[9] Perhaps it was the heterogeneity of the term "tort" that caused the drafters of the Uniform Act to shun its use in establishing the model statute. They chose instead to rely upon the elements of *act* and *injury,* and apparently in an effort to avoid constitutional problems that they perceived to be present, *see* Beaty v. M. S. Steel Co., *supra,* 401 F.2d at 159, they mandated that something more than the injurious conse-

clause. *But see* Beaty v. M. S. Steel Co., 401 F.2d 157, 160–162 (4th Cir. 1968), cert. denied, 393 U.S. 1049, 89 S.Ct. 686, 21 L.Ed.2d 691 (1969), *and* part IV *infra.*

9. *See* St. Clair v. Righter, 250 F.Supp. 148, 151 (W.D.Va.1966), where when discussing Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961), the court stated: "In Gray, the actual 'act' which precipitated the injury was the manufacture of the defective valve, which occurred outside Illinois. This was not a 'tortious act,' however, until the hot water heater exploded and caused injury to the plaintiff, and this occurred in Illinois."

The *Gray* court itself noted, 176 N.E. 2d at 763, that "[t]o be tortious an act must cause injury. The concept of injury is an inseparable part of the phrase."

quences of an act committed elsewhere was necessary to vest jurisdiction.

The "act," of course, is the act of the alleged tortfeasor—here that act, uttering defamatory statements, occurred in Wisconsin. Nothing can change that fact. The additional facts that other third party acts were necessary to consummate the tort, or that the injury itself took place within the District, cannot under our reading of the Uniform Act grant jurisdiction that is otherwise lacking. Unless we wish to delve into a magical mystery tour of "projecting presences," we must find that no jurisdiction can be afforded by virtue of section (a)(3).[10]

Appellant's reliance on cases such as Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970), and State ex rel. White Lumber Sales, Inc. v. Sulmonetti, 252 Or. 121, 448 P.2d 571 (1968), is misplaced. These cases hold that an individual may "transact business" in a state, although not physically present therein, through telephone calls made into that state. In *Parke-Bernet*, for instance, the defendant's participation in an auction through the use of a California-New York telephone hookup subject-ed him to jurisdiction under New York's long-arm statute (specifically that provision dealing with "transacting business" within the jurisdiction), in a breach of contract action arising out of purchase contracts made by the defendant during the auction. It should be noted that the "transacting business" sections have generally been given broad interpretation, normally limited only by due process considerations,[11] and meaningful guidelines have been established by the Supreme Court to determine in a commercial setting the limits of due process. *See* International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); McGee v. International Life Insurance Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); *and* Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). The Uniform Act itself recognizes this, for the Commissioners' Note regarding section (a)(1), the "transacting business" section, states that "[t]his provision [(a)(1)] should be given the same expansive interpretation that was intended by the draftsmen of the Illinois Act and has been given by the courts of that state." 9B Uniform Laws Annot. at 310–11 (1966).[12]

10. Appellant seeks to place appellee Johns constructively within the jurisdiction because of her use of the telephone. "The caller," appellant asserts, "in a real sense exercises control over the receiving instrument located in the District of Columbia." Brief for Appellant at 19. She can thus be said to control, we suppose, a mechanical agent in the District, and this control purportedly "project[s] [her] presence into the forum." The act with which we are concerned is that of uttering defamatory statements. If appellee Johns were to engage in, or control, other activities within the District she might be subject to (a)(4) jurisdiction, but the fact that she "is in fact using a tangible physical instrument . . . to cause and simultaneously control actual physical events [in the District], such as the ringing of bells, flashing of lights, perhaps, and, most important, the reproduction of the sounds of the caller's voice," hardly renders her susceptible. Brief for Appellant at 19.

11. In Gilliam v. Moog Indus., Inc., 239 Md. 107, 210 A.2d 390, 392 (1965), the Maryland Court of Appeals stated, in dicta, that the legislative intent in adopting Maryland's long-arm statute "was to give the courts of the State personal jurisdiction over all out of state persons and corporations which constitutionally could be reached . . . ." Although because of the actual statutory language utilized this statement has proven to be "not strictly accurate" with respect to sections (a)(2), (a)(3), and (a)(4), *see* Piracci v. New York City Employees' Retirement System, 321 F.Supp. 1067, 1070 (D.Md.1971), there appears to be little doubt as to its accuracy regarding section (a)(1). *See* Groom v. Margulies, 265 A.2d 249, 257 Md. 691 (1970). For comparable treatment under the Virginia long-arm statute, *see* John G. Kolbe, Inc. v. Chromodern Chair Co., 211 Va. 736, 180 S.E.2d 664 (1971).

12. Initially the Illinois courts held "that the performance of jurisdictional acts, by

No claim has been advanced that personal jurisdiction can be exercised here because we are dealing with a "claim for relief arising from . . . transacting any business in the District of Columbia." 13 D.C.Code § 423(a)(1) (Supp. V, 1972). The fact that other courts dealing with such claims have looked to the background and general language of the "transacting business" section in justifying the exercise of personal jurisdiction, despite the physical absence of the defendant, is not persuasive. We are dealing with a precise and intentionally restricted tort section whose language and history mandate a different result.

In Murphy v. Erwin-Wasey, Inc., 460 F.2d 661 (1st Cir. 1972), the first circuit court of appeals was presented with a factual situation involving an action for misrepresentations made by a nonresident over the telephone and through the mail. In interpreting a Massachusetts statute, M.G.L.A. ch. 223A, § 3(c) (Cum.Supp.1972), granting personal jurisdiction for "causing tortious injury by an act or omission in this commonwealth," the court found that "[w]here a defendant knowingly sends into a state a false statement, intending that it should there be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state." 460 F.2d at 664 (footnote omitted). The court further stated:

> We would be closing our eyes to the realities of modern business practices were we to hold that a corporation subjects itself to the jurisdiction of another state by sending a personal messenger into that state bearing a fraudulent misrepresentation but not when it follows the more ordinary course of employing the United States Postal Service as its messenger.

*Id.*

We hope that we are not "closing our eyes to the realities" of the situation, but rather opening them to the realities of the statute. The statute is in plain, easy to understand language—it speaks not of "tortious act" but of "act," and its structure shows an intent that when an act is outside the forum state other significant contacts are necessary before jurisdiction can be exercised. Its interpretation should be so limited.

The underlying premise of the *Murphy* opinion seems to be that negligent and intentional acts should be treated differently when interpreting statutory jurisdictional language. The *Murphy* court apparently agrees that jurisdiction would not lie had the act with which the court was concerned been negligent, for that act "merely creates the condition

---

defendant or its agents while physically present in Illinois, is essential for submission to the jurisdiction of the courts of this state under Section 17(1)(a) ['transaction of any business within this State']." Saletko v. Willys Motors, Inc., 183 N.E.2d 569, 571, 36 Ill.App.2d 7 (1962). The development of the *Gray* decision, however, soon brought about a recision of this doctrine, for in Koplin v. Thomas, Haab & Botts, 73 Ill.App.2d 242, 219 N.E.2d 646, 652 (1966), the Appellate Court of Illinois stated:

> We believe there is no substantial reason for differentiating personal injury actions from business transactions insofar as the physical presence of the defendant is concerned, and that physical presence in the State is a factor but should not be the controlling factor in determining jurisdiction. We will

follow *Gray* in holding that jurisdiction over a non-resident defendant pursuant to section 17 does not depend upon the defendant or its agent having participated in a substantial transaction of business while physically present in Illinois.

*But see* National Products Specialist, Inc. v. Bristol Yacht Co., No. 7504–72 (Sup.Ct.D.C. March 28, 1973), holding that the "defendant or his agent must be physically present in the District of Columbia transacting any business therein" to be amenable to jurisdiction under the provisions of 13 D.C.Code § 423(a)(1) (Supp. V, 1972), and finding that result mandated not only by statutory construction but also by constitutional due process. *See also* Auerbach, The "Long Arm" Comes to Maryland, 26 Md.L.Rev. 13, 33–36 (1966).

from which damage might later arise." *Id.* Evidently an intentional act, however, is a type of continuing wrong which carries its perpetrator mysteriously along and thrusts him, constructively of course, into the domain of the injurious consequences. The law regarding jurisdiction matters is confusing enough; it needs less legal fictions, not more.

We agree that whether an act is intentional or negligent can have a distinct bearing on whether the exercise of jurisdiction thereover is constitutional, for it goes directly to fairness and the degree to which an individual has purposefully availed himself of the privilege of conducting activities within the forum state. *See* Hanson v. Denckla, *supra*, Rosenblatt v. American Cyanamid Co., 86 S.Ct. 1, 4, 15 L.Ed.2d 39, appeal dismissed, 86 S.Ct. 256, 15 L.Ed.2d 192, 382 U.S. 110 (1965), *and* part IV *infra*. We are at a loss to understand what bearing this has on the question of where the act took place, however, and note that the drafters of the Uniform Act did not distinguish between acts of an intentional and negligent nature. We find our result no more anomalous than that reached in a commercial setting when two foreign companies ship defective goods into a state and there is resulting injury. The Uniform Act clearly distinguishes between that company which only ships the goods into the state and that which actually conducts within the state activities regarding the sale. *See* Vitro Electronics v. Milgray Electronics, Inc., *supra*, 258 A.2d at 754.

## IV

When considering the applicability of any long-arm statute to a particular fact situation courts invariably engage in a two prong analysis. It is necessary initially to determine whether the statute by its language would permit service of process on a non-resident defendant, and secondly whether service under the statute would nonetheless contravene the due process clause of the federal constitution. *See* Haynes v. James H. Carr, Inc., *supra*, 427 F.2d at 703. It is axiomatic, however, that the due process clause is utilized as a limit upon a state's power and not as a mandate for the exercise of that power. *See* Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 440, 72 S.Ct. 413, 96 L.Ed. 485 (1952); Missouri Pacific R.R. Co. v. Clarendon Boat Oar Co., 257 U.S. 533, 535, 42 S.Ct. 210, 66 L.Ed. 354 (1922); Beaty v. M. S. Steel Co., *supra*, 401 F.2d at 161; *and* Arrowsmith v. United Press International, 320 F.2d 219, 222 (2d Cir. 1963). *See also* Note, Developments in the Law—State-Court Jurisdiction, 73 Harv.L.Rev. 909, 998–1008 (1960). "Thus, it is clear that at least where the legislature has acted, even though the statute may not go to the limits of due process, the courts of a state may not go further and assert jurisdiction over persons not embraced within that legislation." Beaty v. M. S. Steel Co., *supra*, 401 F.2d at 161. Since we have found that the long-arm statute currently in effect in the District of Columbia does not by its terms afford section (a)(3) personal jurisdiction over the appellees, we need not decide the hypothetical question of whether if it did such an assertion of jurisdiction would be constitutional.

Our decision today is completely in accord with the currently prevailing case law in Maryland and Virginia: (1) St. Clair v. Righter, 250 F.Supp. 148 (W.D. Va.1966), is the only case to date in either jurisdiction which has involved out-of-state intentional actions resulting in in-state tortious injury. The federal district court in *St. Clair*, interpreting Virginia law, stated, 250 F.Supp. at 151:

In the instant case, the alleged tortious injury occurred upon the publication of the alleged libel within Virginia, but this was caused by the *act* of writing and mailing the letters *outside* Virginia. Plaintiff, therefore,

must predicate jurisdiction upon paragraph (4) . . . .[13]

(2) We have already noted, *see* text at pp. 1216–1217 *supra*, that when dealing with out-of-state *negligent* acts or omissions which cause tortious injury within the state the Maryland and Virginia courts have uniformly rejected jurisdiction where the only contact with the state was that tortious injury. (3) Finally, although both the Maryland Court of Appeals and Virginia Supreme Court of Appeals have interpreted the language of their statutes as expressing a legislative purpose that personal jurisdiction be afforded over all out-of-state persons and corporations that constitutionally could be reached, *see, e. g.,* Gilliam v. Moog Industries, Inc., 239 Md. 107, 210 A.2d 390, 392 (1965), *and* Carmichael v. Snyder, 209 Va. 451, 164 S.E.2d 703, 707 (1968), the developing case law in both states supports the view that while that statement may prove true as to some of the subsections, notably (a)(1) and (a)(6), it does not as to others, notably (a)(3) and (a)(4). *See* Haynes v. James H. Carr, Inc., *supra,* 427 F.2d at 704; St. Clair v. Righter, *supra,* 250 F. Supp. at 150–151, for cases discussing Virginia sections (a)(3) and (a)(4); *and* Vitro Electronics v. Milgray Electronics, Inc., *supra,* 258 A.2d at 753 n.3; Beaty v. M.S. Steel Co., *supra,* 401 F.2d at 159; Malinow v. Eberly, 322 F.Supp. 594, 598 n.2 (D.Md.1971); Piracci v. New York City Employees' Retirement System, 321 F.Supp. 1067, 1070 (D.Md. 1971), for cases discussing Maryland sections (a)(3) and (a)(4).[14] The Maryland federal district court in *Piracci* summarized this development as follows:

> If we consider the outer limits of jurisdiction permitted by the Due Process Clause as the circumference of a circle or the outer edge of a pie, and the six "enumerated acts" in § 96(a)(1)-(6) as six slices of the pie, it appears that some slices go all the way to the outer limit of the circle, while others stop short of the outer limit.

321 F.Supp. at 1070 n.3. It is evident that the service of process made pursuant to section (a)(3), "causing tortious injury in the District of Columbia by an act or omission in the District of Columbia," must fail.

We recognize that the interpretation we adopt here today may work seemingly "harsh" results in selected instances which, to paraphrase Judge Friendly, are more frequently hypothesized than encountered.[15] We suppose that any interpretation of a long-arm statute which restricts its reach to less than conceivable, or conceivably constitutional, limits will be so considered. We note, however, that the parties to the lawsuit are not without access to other forums; that the vindication of fundamental human rights is not at issue; and, finally, that such an interpretation is most reasonable in view of all that we have previously discussed. It is not for us but for Congress to alter the statute as written.

### V

Appellant alleges that even if personal jurisdiction fails under the strictures of section (a)(3) he is nevertheless afforded it as to The Journal by virtue of section (a)(4), because The Journal "engages in . . . [a] persistent course of conduct" within the District. The record discloses that The Journal maintains three permanent offices in the National Press Building

13. *See* note 9 *supra.*

14. For Virginia and Maryland cases involving section (a)(1), *see, e. g.,* Groom v. Margulies, 257 Md. 691, 265 A.2d 249 (1970); Harris v. Arlen Properties, Inc., 256 Md. 185, 260 A.2d 22 (1969); Van Wagenberg v. Van Wagenberg, 241 Md. 154, 215 A.2d 812 (1966) (discussing a similar New York section); Hardy v. Rekab, Inc., 266 F.Supp. 508 (D.Md. 1967); *and* John G. Kolbe, Inc. v. Chromodern Chair Co., 211 Va. 736, 180 S.E.2d 664 (1971); Carmichael v. Snyder, 209 Va. 451, 164 S.E.2d 703 (1968).

15. *See* Buckley v. New York Post Corp., 373 F.2d 175, 179 (2d Cir. 1967).

here in the District, and has assigned three reporters to the District for the purpose of gathering news for its two newspapers, the *Milwaukee Sentinel* and *Milwaukee Journal*.

Over forty years ago this court in Neely v. Philadelphia Inquirer Co., 61 App.D.C. 334, 62 F.2d 873, 875 (1932), held that on facts analogous to these "the mere collection of news material here for use in subsequent publication elsewhere, in the manner and extent shown in this case, is not a doing of business here, within the meaning of the statute." The statute in question in *Neely*, currently codified as 13 D.C.Code § 334 (1967), was the original long-arm statute in use in the District. We find nothing in the legislative history or language of the Uniform Act as adopted in the District to indicate that Congress sought to reverse the *Neely* precedent, as affirmed in Layne v. Tribune Co., 63 App.D.C. 213, 71 F.2d 223, cert. denied, 293 U.S. 572, 55 S.Ct. 83, 79 L.Ed. 670 (1934), and Bulletin Co. v. Origoni, 128 U.S.App.D.C. 282, 387 F.2d 240, cert. denied, 389 U.S. 928, 88 S.Ct. 287, 19 L. Ed.2d 278 (1967), when it adopted the new long-arm statute. We must affirm the district court's determination that "the same reasons which militated against the assertion of jurisdiction over foreign newspaper corporations whose local contacts arose solely out of the gathering of news also apply to limit our jurisdiction under the recently enacted long-arm statute." 333 F.Supp. at 946. In the words of Associate Justice Hitz, writing in *Neely*, 62 F.2d at 875, "[a]s the seat of national government, Washington is the source of much news of national importance, which makes it desirable in the public interest that many newspapers should maintain vigilant correspondents here."

Accordingly, the order of the district court granting the appellees' motions to dismiss and quash service of process is

Affirmed.