**The FOUNDING CHURCH OF SCIENTOLOGY OF WASHINGTON, D. C., Appellant,**

v.

**Heinrich Bauer VERLAG et al.**

**No. 74–1789.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 22, 1975.

Decided June 1, 1976.

Samuel H. Seymour, Washington, D. C., for appellant. Earl C. Dudley, Jr., Arlington, Va., was on the brief for appellant.

Irvin B. Nathan, Washington, D. C., with whom Edgar H. Brenner and Werner Kronstein, Washington, D. C., were on the brief for appellee German Language Publications, Inc.

Before McGOWAN and MacKINNON, Circuit Judges, and McMILLAN,* United States District Judge for the Western District of North Carolina.

Opinion for the court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge.

In this diversity action the Founding Church of Scientology of Washington, D. C.[1] sued (1) the author, editor, publisher, and distributor of an allegedly defamatory article which appeared in the July 1973 edition of the German-language magazine *Neue Revue,* and (2) an official of the West German federal criminal investigating authority who allegedly aided in the preparation of that publication.[2] The district court dismissed the suit on the grounds (1) that it lacked personal jurisdiction over any of the defendants under the District of Columbia "long arm" statute[3] and (2) that suit in the District of Columbia was barred under the doctrine of *forum non conveniens.*[4] Appeal

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. The Founding Church of Scientology of Washington, D. C., is a nonprofit corporation, organized under the laws of the District of Columbia, which engages in the active exercise, practice, and proselytization of "Scientology" in the District of Columbia. App. 1. It will hereinafter be referred to as the "Church" or the "Church of Scientology." The Church is apparently affiliated in some way with other churches of Scientology in other jurisdictions, both domestic and foreign, but the exact nature of this relationship does not appear in the record.

2. The article, which appears in English translation at App. 9–12, describes the terrorization of two women by West German Scientologists, reports on the recruitment there of new "victims" of Scientology, and notes an investiga-

tion into the activities of Scientologists by the West German Federal Criminal Affairs Bureau.

Of a total of approximately 1,400,000 copies of the issue in question, 56 reached the District of Columbia where they were distributed to four news dealers who are not parties to this action; of the 56 copies, 30 were sold and the rest returned.

3. D.C.Code § 13–423 (1973).

4. Virtually identical suits in New York and California have been dismissed on these two grounds. *See Church of Scientology of California v. Herold,* No. C–66230 (Superior Court for the County of Los Angeles, March 12, 1974); 172 N.Y.L.J. No. 1 at 13 (July 1, 1974) [Appellee's Supp. Appendix at 8]. Other suits have been filed in West Germany (both Munich and Wiesbaden), Holland, and Canada. On October 21, 1975, the appellee filed with this court a copy of a November 1974 decision by the Wiesbaden court holding that the article was not

was then filed as to all defendants, but appellant later consented to dismissal as to all appellees except the distributor, a New York corporation, German Language Publications, Inc. [GLP].[5] As regards this one remaining appellee we disagree that the action should have been dismissed, and reverse.

*Personal Jurisdiction*

■ In order for a court to properly assert personal jurisdiction over a nonresident defendant, service of process over the nonresident must be authorized by statute and be within the limits set by the due process clause of the United States Constitution. *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In the District of Columbia, the relevant "long arm" statute provides:

> (a) a District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's—·
>
> \* \* \* \* \* \*
>
> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or *derives substantial revenue* from goods used or consumed, or services rendered, in the District of Columbia.

D.C.Code § 13–423(a)(4) (1973) (emphasis added).

■ The District of Columbia "long arm" statute is a slightly modified version of the Uniform Interstate and International Procedure Act, 13 U.L.A. 285, § 1.03 (1975), which was drafted by the National Confer-ence of Commissioners on Uniform State Laws several years after the famous decision in *Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 176 N.E.2d 761 (1961), interpreted the Illinois long-arm statute to cover a nonresident defendant who had no connection with the state except that it had acted negligently out of state, causing injury within the state. The Uniform Act (and derivatively the D.C. Code) draws back from the limits set by expansive opinions such as *Gray*, and "was presumably devised to obviate any possible due process objections." *Margoles v. Johns*, 157 U.S.App.D.C. 209, 213, 483 F.2d 1212, 1216 (1973). Consistent with this intent, section 423(a)(4) requires, in addition to conduct outside the District which causes injury· within the District, some other reasonable connection between the District and the defendant. Viewed in light of the statute's history, such a connection sufficient to authorize the assertion of personal jurisdiction over a nonresident defendant can be demonstrated *only* by proving that the defendant has one of three types of contact with the District *and* that the connection at least evinces the minimum contact with the District sufficient to satisfy traditional notions of fair play and substantial justice. *See International Shoe Co. v. Washington, supra*, 326 U.S. at 316, 66 S.Ct. 154, 90 L.Ed. 95.

■ One way in which this "reasonable connection" can be shown under the Uniform Act and D.C.Code § 13–423(a)(4), is by demonstrating that the defendant has derived "substantial income" from goods used or consumed in the jurisdiction. In the case now before us, GLP has obtained gross revenues in excess of $26,000 over a period of ten months from sales made in the Dis-

---

defamatory under German law; the Wiesbaden action was therefore dismissed.

**5.** Appellee German Language Publications is a New York Corporation with its principal offices in the city of New York. It has no office, employees or agents in the District of Columbia. App. 13. It is not licensed to do business in the District, and does not engage in solicitation or bill-collecting activities therein. App. 15. Its sole connection with the District is to receive German-language magazines from West Germany and to forward them by common carrier to Prudential News in the District, which in turn delivers them to four independent news dealers for ultimate resale. App. 14. GLP received approximately one percent of its gross revenues, or $26,202.63, from magazines sold in the District during the first ten months of 1973. App. 15.

trict—approximately one percent of its total gross revenues.[6] In apparently the only District of Columbia case to interpret this phrase, the court stated that "the test is a qualitative one, that is, a comparison of the revenue relating to the locally used article and total revenue is required." *Liberty Mutual Insurance Co. v. American Pecco Corp.,* 334 F.Supp. 522 (D.D.C.1971). We agree, but feel that the test must embrace more than this. Because their similarly-worded statutes also derive from the Uniform Interstate and International Procedure Act, we think the decisions construing the Maryland[7] and Virginia[8] "long-arm" statutes are entitled to substantial weight in our consideration.[9] In holding that $37,000 worth of window frames sold in Virginia amounted to "substantial revenue" despite the fact that it was only one-half of one percent of the nonresident manufacturer's sales, the Fourth Circuit in *Ajax Realty Corp. v. J. F. Zook, Inc.,* 493 F.2d 818 (4th Cir. 1972), stated the following test:

> * * * Although percentage of total sales may be a factor to be considered, it cannot be dispositive, for a small percentage of the sales of a corporate giant may indeed prove substantial in an absolute sense.[5] On the other hand, it is difficult
>
> [5] Conversely, a relatively small absolute amount might be deemed "substantial" where it constitutes a significant percentage of a small corporation's total sales.
>
> to identify an absolute amount which *ipso facto* must be deemed "substantial."

*Accord, Egeria, Societa di Navigazione Per Azioni v. Orinoco Mining Co.,* 360 F.Supp. 997, 1002 (D.Md.1973).[10] Thus the test looks *both* at the absolute amount and at the percentage of total sales, and determines what is "substantial" on the facts of each case. Here, recognizing the low unit price of each magazine, we think that sales of $26,000 in ten months constitute "substantial revenue" and demonstrate contacts that are sufficiently substantial to establish the "reasonable connection" with the District required by D.C.Code § 13–423 and the Constitution.

In denying personal jurisdiction over the defendants in this case, the district judge cited *Margoles v. Johns, supra,* a 1973 decision of this court, in which we affirmed a denial of personal jurisdiction under D.C. Code § 13–423 in a libel action against a nonresident newspaper publisher who maintained only what are essentially news gathering offices in the District. The ground for our refusal to find jurisdiction under section (a)(4) of the "long arm" statute in that case was what has become known in the District of Columbia as the "newsgathering exception": in minimal contact situations, the First Amendment protects newsgathering activities in the nation's capital and weighs against the assumption of personal jurisdiction over a nonresident publisher. See also *Bulletin Co. v. Origoni,* 128 U.S.App.D.C. 282, 387 F.2d 240, *cert. denied,* 389 U.S. 928, 88 S.Ct. 287, 19 L.Ed.2d 278 (1967); *Layne v. Tribune Co.,* 63 App.D.C. 213, 71 F.2d 223, *cert. denied,* 293 U.S. 572, 55 S.Ct. 83, 79 L.Ed. 670 (1934); *Neely v. Philadelphia Inquirer Co.,* 61 App.D.C. 334, 62 F.2d 873 (1932). Appellee here contends that this exception is broad enough to cover news *dissemination* as well as newsgathering, since the former "is surely more at the core of guaranteed First Amendment rights than news gathering."[11] We disagree.

The purpose of the newsgathering exception was well expressed by the opinion that established it:

> identical long-arm jurisdiction as was then available in Maryland and Virginia.
>
> *Margoles v. Johns,* 157 U.S.App.D.C. 209, 212–13, 483 F.2d 1212, 1215–16 (1973).

**6.** *See* note 5 *supra.*

**7.** Code Md.1957, art. 75, § 96(a)(4).

**8.** 2 Code of Virginia Ann. § 8–81.2(a)(4) (1975 Supp.).

**9.** If anything can be ascertained from the [legislative] history it must be that Congress' overall intent [in enacting D.C.Code § 13–423] was to provide the District's courts, to the greatest extent possible, with essentially

**10.** *See also* Note, *The Virginia "Long Arm" Statute,* 51 Va.L.Rev. 719, 749 (1965), encouraging a "non restrictive, liberal view of the conditions in subsection (4)."

**11.** Appellee's Brief at 32.

As the seat of national government, Washington is the source of much news of national importance, which makes it desirable in the public interest that many newspapers should maintain vigilant correspondents here. If the employment of a Washington correspondent, the announcement of his address, and the payment of his office rent, subjects a nonresident newspaper corporation to legal process in Washington for matter appearing in its paper at home, it would bring in nearly every important newspaper in the nation, and many foreign publishing corporations, which in our opinion the present statute does not do.

*Neeley v. Philadelphia Inquirer Co., supra* at 875. Thus what is being protected by the news gathering exemption is the right of *subscribers* within the area of immediate circulation of a newspaper or magazine [12] to receive news of national interest which must be gathered in the District of Columbia. This is quite different from interpreting the exemption to protect the right of a *publisher* to distribute his product *without responsibility* in foreign jurisdictions. To subject a nonresident publisher to suit in the District merely because he gathers news here *for dissemination elsewhere* would severely constrict the flow of national news to his local subscribers. Viewed this way,

however, the newsgathering exception would not prohibit suits against publishers whose area of immediate circulation includes the District, nor against those who distribute publications in the District which have an area of primary circulation elsewhere. In the former case, the publisher is essentially a local publisher and should be subject to suit here; in the latter case, the suit, being against the importing distributor rather than the publisher, will have no effect on the *primary* distribution of the newspaper or magazine.

■ In the instant case, GLP engages in the distribution of magazines outside the area of their immediate circulation and does not engage in any newsgathering activities in the District. Thus, it has no proper claim to the protection of the newsgathering exception, and we refuse to expand that exception to bar this suit.

*Forum Non Conveniens*

■ The common law doctrine of *forum non conveniens* is codified by D.C.Code § 13–425 (1973), which provides:

When any District of Columbia court finds that in the interest of substantial justice the action should be heard in another form, the court may stay or dismiss such civil action in whole or in part on any conditions that may be just.[13]

12. The existence of a newspaper, no matter how popular, depends primarily upon circulation in the vicinity of its publication. Circulation in other areas may well be welcomed, but it is not critical to the newspaper's continued existence. Circulation beyond the vicinity of publication can be characterized as "passive" in that it is a product of the publication's excellence rather than of a business effort of active solicitation in all areas of the nation. *Curtis Publishing Co. v. Golino,* 383 F.2d 586, 590 (5th Cir. 1967).

13. This District of Columbia statute was relied on by the district court in ruling on the *forum non conveniens* issue. App. 18–19. The statutory reference to "any District of Columbia court," however, does not include *federal* courts in the District of Columbia. *Aiken v. Lustine Chevrolet, Inc.,* 392 F.Supp. 883, 887 n.16 (D.D.C.1975). Moreover, there is a split of authority on the question of whether federal courts in diversity cases are required to apply

the local rule of *forum non conveniens* under the doctrine of *Erie R. R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *Compare Weiss v. Routh,* 149 F.2d 193 (2d Cir. 1945), *with Gilbert v. Gulf Oil Corp.,* 153 F.2d 883 (2d Cir. 1946), *rev'd on other grounds,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). *See also* 1A–2 J. Moore, Federal Practice ¶ 0.317[2] (1974). The Supreme Court has twice refused to rule on this point. *Gilbert v. Gulf Oil Corp.,* 330 U.S. 501, 509, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *Williams v. Green Bay & Western R. R. Co.,* 326 U.S. 549, 558–59, 66 S.Ct. 284, 90 L.Ed. 31 (1946). Although the issue has never been squarely addressed by this court, federal courts in the District have in practice used the federal law of *forum non conveniens. See Altman v. Central of Georgia Ry.,* 124 U.S.App.D.C. 155, 363 F.2d 284, *cert. denied,* 385 U.S. 920, 87 S.Ct. 231, 17 L.Ed.2d 144 (1966); *Aiken v. Lustine Chevrolet, supra.* In any case, the law of *forum non conveniens* in the District of Columbia appears to be identical to federal law on the point at issue in this

Pursuant to this statute and the common law, the district court found *forum non conveniens* to be an alternative ground for dismissal in the present case. On appeal, appellee GLP makes no argument that any other *domestic* jurisdiction would be a better forum for this suit, but only argues that the case should be dismissed in favor of a trial in West Germany, where GLP has pledged to submit to the jurisdiction of the German court.[14]

■ It has long been recognized that federal courts have the power to refuse jurisdiction over cases which should have been brought in a foreign jurisdiction, rather than in the United States. *Prack v. Weissinger,* 276 F.2d 446, 448 (4th Cir. 1960); *Vanity Fair Mills v. T. Eaton Co.,* 234 F.2d 633, 645 (2d Cir. 1956); *Wilson v. Kansas City Southern Ry.,* 101 F.Supp. 56, 60 (W.D. Mo.1951); *Latimer v. S/A Industries Reunidas F. Matarazzo,* 91 F.Supp. 469, 470 (S.D. N.Y.1950); *De Sairigne v. Gould,* 83 F.Supp. 270, 273 (S.D.N.Y.1949). However, a foreign jurisdiction cannot necessarily be considered "a more suitable and convenient forum in which to require the rights of the parties to be determined." *North Branch Products, Inc. v. Fisher,* 109 U.S.App.D.C. 182, 284 F.2d 611 (1960), *cert. denied,* 365 U.S. 827, 81 S.Ct. 713, 5 L.Ed.2d 705 (1961). "The doctrine that a United States citizen does not have an absolute right to use United States courts usually is expressed in the context of a citizen doing business abroad expecting still to use United States courts." *Thompson v. Palmieri,* 355 F.2d 64, 65 (2d Cir. 1966). Moreover, "[m]ost [cases that dismiss on this ground] require that the defendant be vexed and harassed by plaintiff's choice of forum. And usually the defendant was not a United States citizen or resident, and was only served because of minimal contacts with the forum." *Id.* at 66.

■ We think it to be of great significance that both plaintiff and the remaining

defendant here are residents of the United States and that plaintiff seeks damages for a libelous publication *in the District of Columbia.* Complaint at ¶ 11. In incorporating in this country and locating here, they have in effect signified their willingness to be sued in American courts. *Cf. Dorati v. Dorati,* 342 A.2d 18, 22 (D.C.App.1975). Only two cases have been located where, although the incident forming the basis of the suit had occurred in a foreign jurisdiction, both of the parties were residents of the United States. *See Burt v. Isthmus Development Co.,* 218 F.2d 353 (5th Cir. 1955); *Horovitz v. Renault, Inc.,* 162 F.Supp. 344 (S.D.N.Y.1958). Dismissal was denied in both. In *Burt, supra* at 357, the Fifth Circuit stated:

It strikes us as being inconsistent with the very purpose and function of the federal courts to hold that one may decline to hear a case and thereby in effect decree that a citizen must go to a foreign country to seek redress of an alleged wrong. Nevertheless, because we are of the belief that it is unnecessary to do so here, we are not prepared flatly to hold that no discretion exists in *any* such case to decline jurisdiction. Experience has taught that such a holding may prove unsound in extreme cases; and the Supreme Court in the *Swift* case [*Swift & Co. Packers v. Compania Columbiana Del Caribe, S. A.,* 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950)] declined to pass upon a similar point. We leave that question open.

We do, however, express the view that courts should require positive evidence of unusually extreme circumstances, and should be thoroughly convinced that material injustice is manifest before exercising any such discretion to deny a citizen access to the courts of this country.

Finding no extreme circumstances or manifest injustice, the court reversed the order

case. *See Dorati v. Dorati,* 342 A.2d 18 (D.C. App.1975). Therefore, we do not decide whether the district court was correct in holding that the District of Columbia statute controls on this point.

14. Appellee's Brief at 9–10. *Compare Dorati v. Dorati,* 342 A.2d 18, 20 n.3 (D.C.App.1975).

of the district court dismissing a suit by a Texas citizen against a New York citizen over transactions governed by Mexican law. The court specifically rejected the arguments of appellee that all its operations were carried on primarily in Mexico, that all the witnesses were in Mexico, and that an American court would encounter difficulties in applying foreign law. None of these circumstances was considered sufficient to overcome the policy in favor of hearing suits between American residents in a United States court. *See also Vanity Fair Mills, supra* at 646; *Horovitz, supra* at 346; *Garrity v. United States,* 67 F.Supp. 821, 107 Ct. of Cl. 92 (Ct.Cl.1946).

Similar arguments have been made in the case now before us. Although there may be circumstances in which dismissal to avoid the complexities of foreign law can be justified,[15] that is not the case here. Even if the district court should decide on remand that the defamatory character of the article in question is to be determined under German law, a question about which we express no opinion, we note that this issue has already been decided by at least one West German court.[16] Moreover, the case presents important questions—such as the knowledge of the distributor of the article's libelous content—which will turn on evidence collected in the United States, and questions which may be controlled by local law.[17] Similarly, though the defense may intend to call almost exclusively German witnesses, the plaintiff will as a practical matter be required to call many witnesses from this country; and the Federal Rules of Civil Procedure make some provision for obtaining the foreign testimony and evidence that may be required.[18] The risk that foreign evidence cannot be obtained is no greater in federal court in the District of Columbia than it would be in a West German court. Finally, to the extent that language differences present problems, interpreters are available under Fed.R.Civ.P. 43(f).

In *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), the Supreme Court held:

> It is often said that the plaintiff may not, by choice of an inconvenient forum, "vex," "harass," or "oppress" the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.

Our weighing of the relative advantages and obstacles to a fair trial[19] in the District convinces us that, while it is a somewhat inconvenient forum for the defendant, it is by no means apparent that the choice has been prompted by an intent to vex or harass. *See Wheeler v. Societe Nationale Des Chemins De Fer Francais,* 108 F.Supp. 652, 653 (S.D.N.Y.1952); *Latimer v. S/A Industrias Reunidas F. Matarazzo,* 91 F.Supp. 469, 471 (S.D.N.Y.1950). A trial judge has great but not unlimited discretion to apply the doctrine of *forum non conveniens.* Where, as here, there has been no *weighing* of the relative advantages of each forum but only a consideration of the drawbacks of one, that discretion has been abused.

*Reversed.*

---

**15.** *But see* Fed.R.Civ.P. 44.1.

**16.** *See* note 4 *supra.*

**17.** For example, the district judge indicated in his memorandum opinion that, even if he were to reach the merits, the action would in all probability be barred by the District of Columbia "single publication" rule, which the court apparently interpreted to mean that only one plaintiff may institute a defamation action based upon a single alleged libel in one edition of a magazine. App. 19. We think this may misconstrue the purpose of that rule. *Cf. Buckley v. New York Post Corp.,* 373 F.2d 175 (2d Cir. 1967); W. Prosser, Torts 769–70 (4th ed. 1971).

**18.** *See* Fed.R.Civ.P. 28(b), 37(e), 45(e)(2). *See also Thomson v. Palmieri,* 355 F.2d 64, 66 (2d Cir. 1966): "Presumably the witnesses employed by the defendant corporation can be examined in the United Kingdom, by letters rogatory enforced by comity accorded the United States court by United Kingdom courts."

**19.** *Gulf Oil Co. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).