# Aron F. Krantz

## v.

# Air Line Pilots Association, International, et al.

Record No. 920477

February 26, 1993

Present: All the Justices

*Robert F. Gore (Edwin Vieira, Jr.*, on briefs), for appellant.
*Jerry D. Anker (Bernard DiMuro; DiMuro, Ginsberg & Lieberman*, on brief), for appellees.

JUSTICE WHITING delivered the opinion of the Court.

In this action against two defendants for intentional interference with a prospective employment contract, we decide: (1) whether one of the defendants, a nonresident, is subject to service of process under Code § 8.01-328.1 (the long-arm statute); and (2) whether the claim against the other defendant is preempted by the Railway Labor Act (the Act). 45 U.S.C. §§ 151-188 (1988).

Aron F. Krantz filed an action at law against Richard W. Nottke and Air Line Pilots Association, International (ALPA), a labor union, to recover damages for their intentional interference with his

prospective contract as a pilot with United Airlines. Nottke, a resident of New York, who was served with process under the provisions of Code § 8.01-328.1(A)(3),[1] filed a motion to dismiss on the ground that the court lacked jurisdiction over his person. Judge Thomas A. Fortkort sustained Nottke's motion.

Later, Judge Jack B. Stevens sustained ALPA's demurrer that raised the preemption issue. Krantz appeals both rulings.

Because Krantz' action was dismissed without reaching the merits, we consider as true all the material facts properly pleaded in his motion for judgment, all facts impliedly alleged, and all reasonable inferences to be drawn from such facts. *Cox Cable Hampton Roads, Inc. v. City of Norfolk*, 242 Va. 394, 397, 410 S.E.2d 652, 653 (1991).

Krantz, an airline pilot and ALPA member living in Vermont, participated in a strike against his employer, Eastern Airlines. However, Krantz later withdrew from the strike, applied for a job with United, and placed his name on the "recall" list at Eastern.

Upon Krantz' withdrawal from the strike, ALPA placed his name on a "scab"[2] list that contained the names of all Eastern pilots who did not support ALPA's strike at Eastern. The scab list was posted on various bulletin boards in a computer center electronic switchboard system (ACCESS) operated by ALPA from its offices in Herndon, Virginia. ACCESS is a closed computer communications system; ALPA members and staff with the necessary passwords are the only persons who could use ACCESS for communicating with ALPA members, broadcasting messages to various ALPA councils, and posting messages on various "bulletin boards and forums." ALPA controls the contents of any such messages and removes any messages it deems inappropriate.

After a successful job interview with United, Krantz was given the impression that he would be hired, and United advised him that

---

[1] Code § 8.01-328.1 (A) provides in pertinent part:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:

. . . .

(3) [c]ausing tortious injury by an act or omission in this Commonwealth.

[2] A "scab" is variously defined as a "mean, contemptible person: SCOUNDREL" and "a member of a union who refuses to strike or returns to work before a strike has ended." Webster's Third New International Dictionary 2022 (1986).

he would be called soon for a final interview. On September 15, 1989, the day after Krantz' initial interview, Nottke, an Eastern pilot and ALPA member, recorded a message derogatory to Krantz on Nottke's personal computer in New York. In an attempt to prevent Krantz' employment by United, Nottke advised his fellow union members at United and elsewhere of Krantz' interview at United and urged them to "PASS THE WORD" that Krantz had withdrawn from the strike and was a "scab."

Nottke then transmitted his message electronically to ACCESS. As a result of the publication of Nottke's message and ALPA'S scab list, United received over 300 adverse comments about Krantz at its Flight Officer Employment Office in Denver, Colorado. Consequently, United terminated its negotiations with Krantz.

The strike later ended on November 22, 1989. Some time after the strike ended, in further retaliation for the failure of Krantz and other Eastern pilots to support the strike against Eastern, ALPA sought to prevent their future employment as pilots by printing 50,000 copies of its final Eastern scab list or "blacklist"[3] and distributing them to all airlines, air freight carriers, and pilot training organizations. As a result of ALPA's publication of this blacklist, Krantz has been unable to obtain employment as an airline pilot.

### Applicability of Long-Arm Statute

■ First, we consider whether Nottke is within the reach of Code § 8.01-328.1(A)(3), the long-arm statute. In doing so, we recognize that "the function of our long-arm statute is to assert jurisdiction over nonresidents who engage in some purposeful activity in Virginia, to the extent permissible under the Due Process Clause of the Constitution of the United States." *Nan Ya Plastics Corp. v. DeSantis*, 237 Va. 255, 259, 377 S.E.2d 388, 391, *cert. denied*, 492 U.S. 921 (1989).

■ To resolve this issue, we first consider the elements of the asserted cause of action to determine the scope of the statute. The elements of a tortious interference with a contract are:

(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on

---

[3] If a list of non-striking employees is disseminated by a union to prospective employers of any of the non-strikers, it is also described as a blacklist. *Pacific American Shipowners Ass'n*, 98 N.L.R.B. 582, 586 (1952).

the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Chaves v. Johnson*, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985). We are concerned with whether Nottke's activities in New York satisfied the third element of this tort.

In support of his claim that he committed no act in Virginia that subjects him to Code § 8.01-328.1(A)(3), Nottke cites a number of cases in which fraudulent or defamatory statements were generated in a foreign state and transmitted by telephone or mail to the forum state. In those cases, the courts decided that such activities were not "acts" in the forum jurisdiction within the meaning of Code § 8.01-328.1(A)(3) or an identical statute of another jurisdiction. *Davis v. Costa-Gavras*, 580 F.Supp. 1082, 1087 (S.D.N.Y. 1984); *St. Clair v. Righter*, 250 F.Supp. 148, 150-51 (W.D. Va. 1966); *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 931 (6th Cir. 1974); *Margoles v. Johns*, 483 F.2d 1212, 1221 (D.C. Cir. 1973). In these cases, the nonresidents may have completed their tortious acts in the foreign jurisdictions, although the damage occurred in some other jurisdiction.

We need not decide whether those courts correctly limited the applicable long-arm statutes because we are dealing with a communication that alone was not a tortious act; some further act was required in the forum state to complete Nottke's act of tortiously interfering with Krantz' prospective contract. Specifically, the entry of Nottke's message on his computer in New York was only the beginning of his plan to block Krantz' employment. To execute his plan, Nottke needed other persons to communicate his message to United, Krantz' prospective employer. He intended those persons to be fellow ALPA members, especially United pilots, who, at Nottke's request, would transmit negative comments about Krantz to United and thereby block Krantz' prospective employment.

Without the use of ACCESS, a Virginia facility, Nottke could not have obtained those recruits, and there would have been no interference with Krantz' prospective contract, the third required element for a *prima facie* showing of this tort. *Chaves*, 230 Va. at 120, 335 S.E.2d at 102. Thus, Nottke's use of ACCESS in Virginia as a means of furthering his plan to block Krantz' employment was "an act . . . in this Commonwealth" within the meaning of Code § 8.01-328.1(A)(3).

This brings us to the question whether our construction of Code § 8.01-328.1(A)(3) would offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985). In our opinion, the facts alleged indicate that Nottke has engaged in a purposeful activity in Virginia, and has had the minimum contact necessary for Krantz to maintain his action in the Commonwealth. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779 (1984) (transmitting libelous material into foreign state injuring nonresident plaintiff); *Murphy v. Erwin-Wasey, Inc.*, 460 F.2d 661, 664 (1st Cir. 1972) (telephoning and mailing intentionally deceptive material from foreign jurisdiction into forum state).

■ Accordingly, we hold that subjecting Nottke to the personal jurisdiction of a Virginia court does not offend "traditional notions of fair play and substantial justice." Therefore, we will reverse the trial court's dismissal of Nottke for lack of personal jurisdiction.

*Preemption Issue*

■ Next, we consider ALPA's contention that federal law preempts Krantz' common-law right to sue ALPA for its alleged tortious interference with his prospective employment with United. In doing so, we bear in mind that if Congress has not stated explicitly that state law is preempted, courts will sustain a state cause of action "unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States." *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978) (administration of employee pension plans). *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 23 (1987) (state employment benefit plan not preempted by Employee Retirement Income Security Act of 1974 or the National Labor Relations Act (NLRA)).

In this case, we are presented with a union's retaliatory conduct against a member who withdrew from the strike and was seeking employment from a stranger to the strike. The conduct in question took place both during and after the strike. Although the record does not disclose the period after the strike in which ALPA continued to publish its scab list or blacklist, at oral argument, counsel for Krantz and ALPA indicated that ALPA continued publication for 14 months after the strike ended.

ALPA contends that there is no time restriction upon the publication of its blacklist. Indeed, in oral argument, its counsel opined that it could use this form of ''self help'' 140 months after the strike ended.

And according to ALPA, blacklisting is not expressly ''addressed'' by federal law, but such conduct that ''falls within the broad area as to which [the Railway Labor Act] requires uniformity of regulation. That broad area includes, in particular, strike-related conduct.''

■ Initially, we do not agree that blacklisting is not ''addressed'' by federal law. A number of federal cases, brought under the NLRA, have addressed the issue of a union's retaliatory blacklisting of an employee in an attempt to restrict or prevent the employee's future employment. Indeed, some of these cases involve blacklisting in retaliation for the employee's nonsupport of a strike, as in this case, and they indicate that such blacklisting is *proscribed* by 29 U.S.C. §§ 158(b)(1)(A) and (b)(2) (1988). *Pacific American Shipowners Ass'n*, 98 N.L.R.B. at 586, 639-40; *see Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 581 n.5 (1988); *Peterson v. Air Line Pilots Ass'n*, 759 F.2d 1161, 1170 (4th Cir.), *cert. denied*, 474 U.S. 946 (1985); *NLRB v. Bell Aircraft Corp.*, 206 F.2d 235, 236-37 (2d Cir. 1953); *Western Gillette, Inc.*, 201 N.L.R.B. 662 (1973).

Moreover, ALPA cites no cases in which preemption has been applied to state court actions such as this one. It argues nonetheless that publication of its scab list is a part of the ''self-help'' activities countenanced in *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369 (1969) and *Peterson*, 759 F.2d at 1170.

■ However, neither *Jacksonville Terminal* nor *Peterson* supports ALPA'S position.[4] *Jacksonville Terminal* involved conduct (secondary picketing) that is recognized by federal law. And *Peterson* simply stands for the proposition that in cases where a plaintiff asserts a

---

[4] Nor do the other cases cited by ALPA support its contention. *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132 (1976) (unsuccessful attempt by employer to invoke state unfair labor practice statute as bargaining tool in unresolved labor dispute); *Guss v. Utah Labor Relations Bd.*, 353 U.S. 1 (1957) (unsuccessful attempt by employees' union to have state labor relations board decide unfair labor practice complaint against employer upon which National Labor Relations Board declined jurisdiction); *Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767 (1947) (in dispute between employees' union and employer, conflict resolved between federal and state labor laws as to right of foremen to bargain through union).

federally protected employee's right, his remedy for the violation of that right is limited to that provided by federal law. Because he was only an *applicant* for employment, Krantz has no federally protected right. *See Nelson v. Piedmont Aviation, Inc.*, 750 F.2d 1234, 1237 (4th Cir. 1984), *cert. denied*, 471 U.S. 1116 (1985).

■ We have considered the federal policy proscribing such blacklisting, the fact that Krantz has no remedy under federal law, and the interest of the states in protecting citizens' legitimate employment rights. And we fail to see that state enforcement of Krantz' cause of action against ALPA will conflict with federal law, frustrate the federal scheme, or enter into a field that Congress sought to occupy to the exclusion of the states, in violation of the principle articulated in *Malone*, 435 U.S. at 504.

Accordingly, we conclude that the trial court erred in sustaining ALPA'S demurrer on the grounds of preemption. Therefore, we will reverse the trial court's ruling on this ground.

In conformity with our ruling on the issues involved here, we will remand the case against Nottke and ALPA for further proceedings consistent with this opinion.

*Reversed and remanded.*