**Steve BOCHAN, Plaintiff,**

v.

**Ray LA FONTAINE, Mary La Fontaine, Robert Harris, Defendants.**

**No. Civ.A. 98–1749–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

May 26, 1999.

Clara A. Williamson, Alexandria, VA, for plaintiff.

Bernard S. Cohen, Cohen, Dunn, Curcio Keating, Rohrstaff, PC, Alexandria, VA, for the LaFontaine defendants.

Richard S. Mendelson, Alexandria, VA, for Harris defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This is an Internet [1] libel case. Plaintiff, a Virginia resident, alleges that defen-

---

1. The Internet has been accurately described as "a giant network which interconnects innumerable smaller groups of linked computer networks" and thus is "a network of networks." *See ACLU v. Reno*, 929 F.Supp. 824, 830–32 (E.D.Pa.1996), *aff'd*, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ("No single entity—academic, corporate, governmental, or non-profit-administers the Internet.... There is no single centralized storage location, control point, or communications channel for the Internet, and it would not be technically feasible for a single entity to control all of the information conveyed on the

dants, Texas and New Mexico residents, defamed him in Virginia and elsewhere by posting libelous messages from Texas and New Mexico on an Internet newsgroup. At issue is whether there is personal jurisdiction over defendants in Virginia. For the reasons that follow, defendants' alleged activities are sufficient to warrant personal jurisdiction.

## I.

Plaintiff, a devoté of John F. Kennedy (JFK) conspiracy theories, is the district manager of a group of theaters in Northern Virginia. Journalists Ray and Mary La Fontaine are Texas residents who wrote a book on the JFK assassination entitled *Oswald Talked: The New Evidence in the JFK Assassination*. Defendant Robert Harris, who is yet another JFK conspiracy devoté, is a resident of Albuquerque, New Mexico, where he owns Computer Works, a New Mexico-based computer systems business.

Plaintiff purchased the La Fontaines' book at Borders Bookstore in Fairfax, Va. sometime after it was published in 1996. He became a vocal critic of the book, often expressing his criticisms via the Internet, specifically by posting his critiques to the interactive newsgroup *alt.conspiracy.jfk*.[2] These postings provoked defendants to post responses to the newsgroup, which responsive postings are the alleged defamations in this action.

The principal precipitating event occurred on October 12, 1998, when plaintiff posted a message to the La Fontaines that contained the following quote from the acknowledgments of the La Fontaine's book: " 'We thank Charlotte and Eugenia for putting up with weird parents.' "[3] The next day, Ray La Fontaine responded from Dallas, Texas, by posting a message to *alt.conspiracy.jfk*.[4] This October 13, 1998 posting was labeled "The scum posts of Bochan," and stated, "I know you like kids, Bochan, but I suggest you limit your interest to trolling in *alt.sex.festish.tinygirls* and leave our children out of it." La Fontaine then went on in this posting to provide "for anyone interested" what La Fontaine claimed was Bochan's October 1997 author profile with Deja News, an Internet discussion network.[5] This author profile, as provided by Bochan, listed 238

---

Internet."). It has been likened to a room filled with spiders, the webs of each being so interconnected that the spiders can travel freely throughout the maze of webs. *See* Nature of the Internet <http://www.mathsoft.org/internetnature.htm>.

**2.** This newgroup is described by Bochon's proffered expert in computer network technology as a "USENET newgroup," which a recent federal case concerning obscenity on the Internet correctly described in the following terms:

USENET newsgroups are disseminated using ad hoc, peer to peer connections between approximately 200,000 computers (called USENET "servers") around the world. For unmoderated newsgroups, when an individual user with access to a USENET server posts a message to a newsgroup, the message is automatically forwarded to all adjacent USENET servers that furnish access to the newsgroup, and it is then propagated to the servers adjacent to those servers, etc. The messages are temporarily stored on each receiving server, where they are available for review and

response by individual users. The messages are automatically and periodically purged from each system after a time to make room for new messages. . . .

*See Reno*, 929 F.Supp. at 834–35.

**3.** Charlotte and Eugenia are the La Fontaines' daughters.

**4.** La Fontaine posted the message using the La Fontaines' America OnLine (AOL) account, accessing the Internet through their Internet service provider, Earthlink.net. AOL is located in Herndon, Virginia; Earthlink.net is located in Pasadena, California. The La Fontaines' AOL account is an auxiliary service that the La Fontaines used to screen responses to their posts; the AOL account does not provide access to the Internet, but instead specifically requires that the subscriber provide its own access to the Internet through another Internet service provider, such as Earthlink.net.

**5.** DejaNews is located in New York City, New York.

articles,[6] allegedly posted by Bochan, identifying the individual newsgroups to which each article was posted. The majority of the articles were listed as posted to various conspiracy theory sites, but according to La Fontaine's version of the author profile, Bochan also posted articles to three apparently pornographic sites: *alt.sex.fetish.tinygirls*, *alt.sex.pictures.male*, and *alt.sex.snuff.cannibalism.* La Fontaine followed the alleged profile with the following additional editorial comment directed to Bochan: "How come you only posted once to *alt.sex.fetish.tinygirls* and *alt.sex.pictures.male*, Bochan? Did you get lucky the first time around?"

The matter did not end with Ray La Fontaine's seemingly unsavory posting. On October 14, 1998, Mary La Fontaine posted a message on *alt.conspiracy.jfk* to a friend of Bochan's, which defended the La Fontaines' actions in posting the alleged profile from Deja News.[7] In this posting, Mary La Fontaine asserted that her husband had downloaded the profile directly from Deja News, and that she and her husband had decided to "reveal the truth" about the 1997 profile, then roughly a year old, because of the "not-so veiled attempt at intimidation" contained in the reference to the La Fontaines' children in Bochan's October 12, 1998 posting. Not content simply to defend the La Fontaine Deja News profile posting, Mary La Fontaine went on to suggest that Bochan's friend would be derelict as a mother were she to

allow her children to associate with Bochan.[8]

Harris also entered the fray on October 14, 1998, stating, in a posting to *alt.conspiracy.jfk*,[9] that although Harris's children were grown, he could imagine how the La Fontaines must feel to have a "sicko" like plaintiff making "not very subtle references" to their children, and further, expressing the hope that Bochan's "tastes run more to sex.pictures.male than to tinygirls."[10] On October 17, 1998, Harris posted another message to *alt.conspiracy.jfk* which called *alt.sex.fetish.tinygirls* "Bochan's newsgroup."[11]

On the basis of these postings, Bochan sues both the La Fontaines and Harris in the Eastern District of Virginia for defamation and for intentional infliction of emotional distress, alleging that all defendants have publicly accused him of being a pedophile. At the threshold, defendants assert a lack of personal jurisdiction. In support of this contention, the La Fontaines state that they i) have not been in Virginia since 1993, when they drove from National Airport to the District of Columbia, ii) have not participated in any book promotions in Virginia, iii) receive no royalties from Virginia sales as they do not directly sell their book in Virginia, nor do they directly receive royalties on books sold by others in Virginia, but rather receive royalties on the total books sold by

6. "Articles" on Internet newsgroups are essentially analogous to email messages, except that, like print articles, they are published, *i.e.*, they are on the Internet and generally available to anyone accessing the newsgroup.

7. This message was also posted through the La Fontaines' AOL account by way of Earthlink.net.

8. Specifically, Mary La Fontaine wrote in her posting, "It concerns me as a mother, Ms. Junkkarinen, that you may have young children who have spent time with Mr. Bochan. I hope you give this some thought. You are obviously a loyal friend of this man. Perhaps he fulfills some need for you. But I cannot

help but believe that your children should come before anything else, just as mine do."

9. Harris's postings were made through Earthlink.net or High Fiber, a New Mexico-based Internet service provider.

10. This message was apparently in reply to Ray La Fontaine. The posting also stated that Bochan "had the sex stuff removed from Deja News;" the Deja News author profile did not in October 1998 contain what La Fontaine claimed it had contained in October 1997.

11. This message was apparently a reply to a Maryland newsgroup participant.

their publisher to national chains,[12] and iv) have never derived any revenue that they are aware of from Virginia.[13] Moreover, they note as significant that they i) do not have their own website, ii) do not conduct commercial activity over the Internet, and iii) made the allegedly defamatory postings by accessing the Internet through a California-based Internet service provider.

Harris, in support of his personal jurisdiction defense, states that he i) has never conducted any business in Virginia, ii) has only visited Virginia once, in 1994, to attend a Washington, D.C. conference and visit some historic sites in Virginia, iii) did not use any Virginia-based company in posting the allegedly defamatory comments, but instead used either California or New Mexico-based Internet service providers, and iv) did not direct his Internet postings to any Virginia resident. He further notes as significant that i) his website specifically states that Computer Works sells computers only in New Mexico, and ii) Computer Works has never sold any computers or computer products to anyone in Virginia.

Bochan responds that the La Fontaines posted the allegedly defamatory messages using an account with AOL, a Virginia-based company, and moreover, that the La Fontaines have advertised, promoted and sold their book in Virginia.[14] As to Harris, Bochan notes i) that the website for his business, Computer Works, is interactive, contains contact information and advertise-ments, and is accessible to Virginia residents 24 hours a day, and ii) that Harris has advertised specific computers in a variety of newsgroups, suggesting that he would take credit cards over the Internet, and that there were no geographical limitations on buyers. Bochan moreover states that all defendants knew that he resides and works in Virginia, and that the reputational harm, as well as the emotional distress, would be suffered in Virginia.

## II.

■■■ All defendants move to dismiss the complaint pursuant to Rule 12(b)(2), Fed.R.Civ.P., for lack of personal jurisdiction. When the exercise of personal jurisdiction is challenged pursuant to Rule 12(b)(2), Fed.R.Civ.P., the question "is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by the preponderance of the evidence." *See Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir.1989). When a court rules on this issue in reliance upon the complaint and affidavits alone, a plaintiff need only make a *prima facie* showing of a sufficient jurisdictional basis to survive the jurisdictional challenge. *Id.*[15] Specifically, a plaintiff in Virginia must make a *prima facie* showing that first, Virginia's long-arm statute reaches the non-resident defendant given the cause of action alleged and the nature of the defendant's Virginia contacts, and second, that the exercise of personal jurisdiction in

---

12. The La Fontaines' book was published and marketed by Pelican Publishing Company of Gretna, Louisiana to major bookstore chains and distributors located, to the best of their knowledge, in · New York and Tennessee. These major chains and distributors then distributed the book for ultimate resale all over the United States, including in Virginia.

13. The La Fontaines acknowledge that sales of their book in Virginia probably have occurred, but assert that the revenue they receive is only indirectly related to any such sales because of their royalty arrangement.

14. Specifically, Bochan points to another individual's website on which the preface of the La Fontaines' book is reprinted in its entirety with the authors' permission, which is accessible to Virginia residents via the Internet, and to national promotional activities, including an appearance on Oprah Winfrey's talk show, which was accessible to Virginia residents.

15. Moreover, in considering a defendant's challenge to personal jurisdiction, a court must construe all relevant allegations in the light most favorable to the plaintiff and draw the most favorable inferences for the existence of jurisdiction. *See Combs*, 886 F.2d at 676.

the circumstances is consistent with due process, that is, that the long-arm statute's reach in the circumstances does not exceed its constitutional grasp. *See DeSantis v. Hafner Creations, Inc.*, 949 F.Supp. 419, 422 (E.D.Va.1996); *see also Peanut Corp. of Am. v. Hollywood Brands, Inc.*, 696 F.2d 311, 313 (4th Cir.1982). Although Virginia's long-arm statute extends personal jurisdiction "to the outmost perimeters of due process," [16] it nonetheless appears that it is possible "for the contacts of a non-resident defendant to satisfy due process but not meet the specific grasp of a Virginia long-arm statute provision." [17]

Bochan contends that jurisdiction exists over all defendants on the basis of two separate prongs of Virginia's long arm statute, Va.Code § 8.01–328.1(A)(3), and § 8.01–328.1(A)(4). Under § 8.01–328.1(A)(3), a court may exercise personal jurisdiction over a defendant who causes "tortious injury by an act or omission in this Commonwealth." *See* Va.Code § 8.01–328.1(A)(3). Under § 8.01–328.1(A)(4), a court may exercise personal jurisdiction over a defendant who causes "tortious injury in this Commonwealth by an act or omission outside this Commonwealth" if that defendant i) regularly does or solicits business in Virginia, ii) engages in any other persistent course of conduct in Virginia, or iii) derives substantial revenue from goods used or consumed or services rendered, in Virginia. *See* Va.Code § 8.01–328.1(A)(4). As defendants contend that neither prong of the long-arm reaches them, each defendant's contacts with the forum must be analyzed in turn under the relevant prongs of the long-arm.

### A. The La Fontaine Defendants

■ Analysis properly begins with the question whether the La Fontaines' conduct fits within the reach of § 8.01–328.1(A)(3). Put more concretely, the question is whether the La Fontaines committed a tort (*i.e.* libel) in Virginia by posting certain messages to an Internet newsgroup via AOL and Earthlink.net. This, as it happens, is a novel question in Virginia and there do not appear to be any decisions from other jurisdictions that are factually identical. There are, however, factually analogous cases that shed some light on how the Supreme Court of Virginia would analyze this issue. In *Krantz v. Air Line Pilots Association, Int'l*, 427 S.E.2d 326, 245 Va. 202 (1993), the defendant airline pilot posted a message from New York to ACCESS, a computer bulletin board physically located in Virginia. This message called for other pilots to pass the word that plaintiff was a "scab," apparently in an attempt to sabotage plaintiff's prospective employment at another airline.[18] The Supreme Court of Virginia concluded that defendant's use of a bulletin board based in a Virginia facility satisfied § 8.01–328.1(A)(3). In reaching this conclusion, the court stated that "[w]ithout the use of ACCESS, a Virginia facility, [defendant] could not have obtained those recruits, and there would have been no interference with [plaintiff's] prospective contract, the third required element for a prima facie showing of this sort." *See Krantz*, 427 S.E.2d at 328.

Several federal district courts have applied the principles enunciated in *Krantz*

---

**16.** *See Peanut,* 696 F.2d at 313. Some states, like California, have enacted long-arm statutes that actually collapse the statutory inquiry into the constitutional inquiry. *See Calder v. Jones,* 465 U.S. 783, 786 n. 5, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) ("California's 'long-arm' statute permits an assertion of jurisdiction over a nonresident whenever permitted by the state and federal Constitutions."); Cal.Civ.Proc.Code § 410.10 (West 1973) ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States.").

**17.** *See Telco Communications v. An Apple A Day,* 977 F.Supp. 404, 405 (E.D.Va.1997) (citing *DeSantis v. Hafner Creations, Inc.,* 949 F.Supp. 419, 423 (E.D.Va.1996)).

**18.** The claim was tortious interference with contract. According to the complaint, the prospective employee airline received over 300 adverse comments about the plaintiff as a result of the message, and thereafter declined to hire him. *See Krantz,* 427 S.E.2d at 327.

to cases alleging Internet torts. In *Telco Communications v. An Apple a Day*, 977 F.Supp. 404 (E.D.Va.1997), the court, in dicta,[19] concluded that jurisdiction existed under § 8.01–328.1(A)(3) on the ground that "[b]ut for the Internet service providers [AOL] and users present in Virginia, the alleged tort of defamation would not have occurred ·in Virginia."[20] Thus, the court concluded that those defendants fell "under the jurisdictional net cast by *Krantz*."[21] In contrast, the court in *Mitchell v. McGowan*, Civ. No. 98–1026–A, 1998 U.S. Dist. LEXIS 18587 (E.D.Va. September 18, 1998) (unpublished disposition), concluded that the defendant "appears to escape [the 'net' cast by *Krantz* ] because the computer bulletin board he accessed is based in Texas," noting that this distinction, though rather "fine," was dispositive.[22] Thus, since *Krantz* courts have focused in large measure on the location of the Internet service provider or the server on which the bulletin board is stored and the role played by this service or hardware in facilitating the alleged tort.

Under this analysis, a *prima facie* showing of a sufficient act by the La Fontaines in Virginia follows from their use of the AOL account, a Virginia-based service, to publish the allegedly defamatory statements. According to Bochan's expert, because the postings were accomplished through defendant's AOL account, they were transmitted first to AOL's USENET server hardware, located in Loudon County, Virginia.[23] There, the message was apparently both stored temporarily and transmitted to other USENET servers around the world. Thus, as to the La Fontaines, because publication is a required element of defamation,[24] and a *prima facie* showing has been made that the use of USENET server in Virginia was integral to that publication, there is a sufficient act in Virginia to satisfy § 8.01–328.1(A)(3).[25]

19. The court had already concluded that personal jurisdiction over the defendants existed under § 8.01–328.1(A)(4).

20. See *Telco*, 977 F.Supp. at 408. The court also noted, regarding the conspiracy and tortious interference claims, that investors and brokers were located in Virginia, and facilities in Virginia were necessary for the investors and brokers to access the press releases. *See id.* The court further noted that because plaintiff was located in Virginia, it absorbed the harm there. *See id.*

21. *See id.*

22. See *Mitchell*, 1998 U.S. Dist. LEXIS 18587, at *7. In that case, a youth posted a message on the Internet accusing the plaintiff of theft from his home in Florida, apparently by accessing a bulletin board based in Texas. *See id.* at *4.

23. Defendants' expert notes that the newsgroup *alt.conspiracy.jfk* was created in Clearwater, Florida, that many newsgroups are unrelated to any specific physical or geographical area, and that the vast majority of messages posted to newgroups via AOL are not specifically targeted at any particular geographical area. These statements do not, however, clarify where and how storage and transmission of the postings on· the newsgroup actually occur.

24. See *Chapin v. Greve*, 787 F.Supp. 557, 562 (E.D.Va.1992) ("Under Virginia law, the necessary elements of the tort of defamation are (1) publication about the plaintiff, (2) an actionable statement, and (3) the requisite intent.").

25. Because there is statutory jurisdiction under § 8.01–328.1(A)(3), it is unnecessary to reach the question whether § 8.01–328.1(A)(4) furnishes a basis for the exercise of personal jurisdiction over the La Fontaines. Still, it is worth noting that § 8.01–38.1(A)(4) does not provide an alternative basis of jurisdiction because the La Fontaines do not regularly do or solicit business in Virginia, engage in any persistent course of conduct in Virginia, or derive substantial revenue from goods used or consumed in Virginia. Without more, neither the preface reprint, which contains no information on how to purchase the book or contact the authors, nor appearances on a national talk show support a claim of solicitation in Virginia. Nor does the sale of the La Fontaines' book in Virginia establish either a persistent course of conduct or the derivation of significant income. A publisher's contacts must be evaluated separately from an author's contacts; jurisdiction does not necessarily exist over an author even where it does exist over a publisher. *See McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1300 (D.C.Cir.1996) ("[W]riting an article for

## B. *Defendant Harris*

 Because Harris did not use an AOL account after accessing the Internet, or use any Virginia-based service, but instead used only the Internet service providers Earthlink, located in California, or High Fiber, located in New Mexico, there is nothing in the record to suggest that Harris committed any tortious act in Virginia within the meaning of § 8.01–328.1(A)(3).[26] Therefore, personal jurisdiction over Harris, if it exists at all, must be based on § 8.01–328.1(A)(4). In this regard, because there is no dispute that the alleged injury occurred in Virginia, the question is whether Harris regularly does or solicits business in Virginia or engages in any persistent course of conduct in Virginia.[27]

a publication that is circulated throughout the nation, including the District, hardly constitutes doing or soliciting business, or engaging in a persistent course of conduct, within the District. The writer is not the publisher; [the writer's] contacts must be assessed separately."); *Insull v. New York World–Telegram Corp.,* 172 F.Supp. 615, 634 (N.D.Ill.), *aff'd* 273 F.2d 166 (7th Cir.1959) (finding no jurisdiction over authors where did not take part in sale or distribution of books within state and no contention that publishers were agents for authors). Moreover, the cases finding jurisdiction over an author on the basis of nationally distributed books generally involve either long-arm statutes broader than Virginia's, or have additional contacts beyond the mere publication of the book. *See, e.g., Brother Records, Inc. v. Harpercollins Publishers,* 141 N.H. 322, 324, 682 A.2d 714 (N.H.1996) (finding jurisdiction under New Hampshire long-arm statute given authorship, a knowledge of intended nationwide distribution and profit from sale of defamatory books in state where defendants conceded they fell within New Hampshire's long-arm statute); *Gray v. St. Martin's Press, Inc.,* 929 F.Supp. 40, 43–45 (D.N.H.1996) (noting under New Hampshire long-arm statute that "a party commits, for jurisdictional purposes, a tortious act within the state when injury occurs in New Hampshire," and concluding jurisdiction exists over author on basis of constitutional inquiry alone); *Bromhall v. Rorvik,* 478 F.Supp. 361, 363–64 (E.D.Pa.1979) (finding jurisdiction against an author under a long-arm statute where the author had traveled twice to forum state in connection with allegedly defamatory book to review page proofs and to promote book).

26. Bochan's contention to the contrary is that jurisdiction under § 8.01–328.1(A)(3) exists because the messages were downloaded in Virginia, and therefore publication, the last act necessary for libel, occurred in Virginia. Rejecting essentially similar contentions, federal courts in non-Internet contexts have uniformly held that defamatory statements generated outside a forum state and transmitted by telephone or mail to the forum are not "acts" in the forum as required by § 8.01–328.1(A)(3) or other similar long-arm statutes. *See Krantz,* 427 S.E.2d at 328 (citing *Davis v. Costa–Gavras,* 580 F.Supp. 1082, 1087 (S.D.N.Y.1984); *St. Clair v. Righter,* 250 F.Supp. 148, 150–51 (W.D.Va.1966), *disapproved on other grounds, Beaty v. M.S. Steel Co.,* 401 F.2d 157 (4th Cir.1968); *Weller v. Cromwell Oil Co.,* 504 F.2d 927, 931 (6th Cir.1974); *Margoles v. Johns,* 483 F.2d 1212 (D.C.Cir.1973)); *see also Booth v. Leaf,* 40 F.3d 1243, 1994 WL 620651 (4th Cir.1994) (unpublished disposition) (" § 8.01–328.1(A)(3) does not grant jurisdiction over a person who wrote and mailed an allegedly defamatory letter outside Virginia."). The Supreme Court of Virginia has not addressed this point, specifically noting in *Krantz* that it was not called upon to do so because there it addressed "a communication that alone was not a tortious act." *See Krantz,* 427 S.E.2d at 328. Here, however, the communication at issue is the tortious act. In the absence of controlling Supreme Court of Virginia precedent to the contrary, and given the statute's clear distinction between the location of the act and the injury, the approach that has generally been followed by the federal courts will be followed here, as well. This approach is particularly sensible in the Internet context given the distinction between i) downloading a defamatory statement in Virginia that was posted by the tortfeasor to a server located outside Virginia, and ii) downloading a defamatory statement posted to a server in Virginia. For the purposes of § 8.01–328.1(A)(3) it does not matter where the defamatory message was downloaded or read. Moreover, any suggestion by Bochan that because Harris was a part of "the events" leading to the lawsuit in some broad sense, Harris is tied to the La Fontaines and thus is necessarily subject to jurisdiction under § 8.01–328.1(A)(3), is also unavailing. *See Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 781 n. 13, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) ("Each defendant's contacts with the forum State must be assessed individually.").

27. There is no contention that Harris derives substantial revenue from goods used in Virginia.

■ Courts determining personal jurisdiction primarily on the basis of Internet activity generally focus on "the nature and quality of activity that a defendant conducts over the Internet."[28] A judicial consensus has generally emerged that personal jurisdiction exists when Internet activities involve the conduct of business over the Internet, including on-line contracting with residents of the jurisdiction or other kinds of substantial commercial interactivity.[29] Federal courts in Virginia in particular have generally found that Internet advertising accessible to Virginia residents 24 hours a day constitutes solicitation of business in Virginia sufficient to satisfy the requirements of § 8.01–328.1(A)(4). Thus, in *Telco*, the district court, addressing § 8.01–328.1(A)(4), found that jurisdiction existed over defendants who had issued press releases on the Internet that allegedly caused the plaintiffs' stock prices to fall. In that case, the district court concluded that defendants were conducting business over the Internet because they were advertising their firm and soliciting investment banking assistance when they posted the press releases. *See Telco*, 977 F.Supp. at 406. The court's reasoning was that "[b]ecause [defendants] conducted their advertising and soliciting over the Internet, which could be accessed by a Virginia resident 24 hours a day" the defendants conducted their business "regularly" under the terms of the long-arm statute sufficient to satisfy 8.01–328.1(A)(4). *Id.* at 407.[30]

Here, Harris, as the owner of Computer Works, has solicited business in Virginia by promoting and advertising his computer hardware company on the Internet through its website, accessible to Virginia Internet users 24 hours a day. This website is interactive in several ways, although no sales are concluded through it.[31] More-

**28.** *See Barrett v. Catacombs Press*, 44 F.Supp.2d 717, 724 (E.D.Pa.1999) (citing *Zippo Mfg. Co. v. Zippo Dot Com., Inc.*, 952 F.Supp. 1119, 1124 (W.D.Pa.1997)).

**29.** *See id.* at 724–25 (citing *Zippo Mfg. Co.*, 952 F.Supp. at 1125–26; *Maritz, Inc. v. Cybergold, Inc.*, 947 F.Supp. 1328, 1333 (E.D.Mo. 1996); *Gary Scott Int'l, Inc. v. Baroudi*, 981 F.Supp. 714, 716–17 (D.Mass.1997); *Superguide Corp. v. Kegan*, 987 F.Supp. 481, 486–87 (W.D.N.C.1997); *Thompson v. Handa–Lopez, Inc.*, 998 F.Supp. 738, 743–44 (W.D.Tex. 1998); *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1264 (6th Cir.1996)).

**30.** *See also Black & Decker v. Pro–Tech Power Inc.*, 26 F.Supp.2d 834, 842 (E.D.Va.1998) (Cacheris J.) (concluding that defendants "regularly solicit business in [Virginia] insofar as each of them advertises their products on World Wide Web sites[, because t]he sites are accessible to any Virginia resident over the Internet, and they provide interested customers with the companies' e-mail addresses"); *Playboy Enterprises, Inc. v. Asiafocus Int'l, Inc.*, Civ. No. 97–734–A, 1998 WL 724000 (E.D.Va. April 10, 1998) (Hilton, J.) ("the willful, bad-faith tortious conduct of defendants ... brings them within this court's personal jurisdiction pursuant to Virginia Code § 8.01–328.1(A)(4)" where foreign defendants purposefully used plaintiff's trademark on its website in an attempt to attract plaintiffs'

customers). The apparently extraordinary reach of the long-arm resulting from this conclusion is limited significantly by the constitutional prong of the jurisdictional inquiry. For example, in *Black & Decker*, Judge Cacheris found that even if the Virginia long-arm was satisfied, the constitutional prong of the analysis was not, because in that case, there was nothing more than these solicitation activities, and " '[t]he placement of a product into the stream of commerce ... is not an act ... [that is] purposefully directed toward the forum State.' " *See* 26 F.Supp.2d at 843. Thus, the mere fact that the defendants manufactured tools with the knowledge that some would be used in Virginia was insufficient. *Id.*

**31.** Though defendant does not conduct sales on his website, the website is sufficiently interactive to factor significantly in the jurisdictional analysis. *See Blumenthal v. Drudge*, 992 F.Supp. 44, 56 (D.D.C.1998) ("Under the analysis adopted by these courts, the exercise of personal jurisdiction is contingent upon the website involving more than just the maintenance of a home page; it must allow browsers to interact directly with the website on some level."); *Zippo Mfg. Co. v. Zippo Dot Com*, 952 F.Supp. at 1124 ("[A] passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction.").

over, even if the website contains sufficient geographic limitations to diminish its jurisdictional significance outside those geographic areas, Harris's own advertisements of specific computers on Internet newsgroups include his name, company and telephone numbers so that he can be contacted, and state that there are no surcharges for Visa or Mastercard, occasionally specifically request reply by email, and in no way appear to place geographical limits on buyers.[32] Under these circumstances, Harris sufficiently advertises and solicits business within Virginia to find personal jurisdiction within the meaning of § 8.01–328.1(A)(4) of the Virginia long-arm.

### III.

◼ Given that § 8.01–328.1(A)(3) reaches the La Fontaines and that § 8.01–328.1(A)(4) reaches Harris, the next question is whether these reaches exceed the constitutional grasp of the provisions.[33] In this regard, the Due Process Clause requires that no defendant shall be haled into court unless defendant has "certain minimum contacts [with the state] … such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). And the constitutional analysis, unlike the statutory analysis, is virtually identical with respect to both the La Fontaines and Harris. The statements made by all defendants posted on the Internet concerned the presumably local activities of an individual each knew was a Virginia citizen.[34] Bochan, and several of his Virginia friends, accessed the postings in Virginia, and the reputational harm resulting from defendants' actions and allegations of pedophilia and sexual deviancy, if any, has been primarily suffered in Virginia, where Bochan lives and works. Under these circumstances, because the predominant "effects" of the La Fontaines' and Harris's conduct are in Virginia, these defendants could reasonably foresee being haled into court in this jurisdiction. *See Calder v. Jones*, 465 U.S. 783, 789–90, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (holding that California court's assertion of personal jurisdiction over Florida-based reporters did not violate due process when allegedly defamatory article that was the basis of the suit focused on the California activities of California residents); *First American First, Inc. v. National Ass'n of Bank Women*, 802 F.2d 1511, 1517 (4th Cir.1986) (concluding that Virginia court's exercise of jurisdiction did not violate Constitution when defendant knew or should have known that its alleged defamation would inflict the greatest injury upon plaintiff in Virginia, the state where he lived and conducted his business); *Telco*, 977 F.Supp. at 407 (noting that assertion of jurisdiction was supported by the fact that the effect of the

---

**32.** It is not material that Harris's solicitations have yielded no sales in Virginia. The statutory language of § 8.01–328.1(A)(4) does not require successful solicitation of business; the statute on its face, by asserting jurisdiction over those who regularly "do or solicit" business in Virginia, contemplates jurisdiction over individuals both who do business and those who merely solicit it. Moreover, there is no reason in principle to require that such solicitations yield actual sales, as the fortuitous fact that no Virginia resident has responded to the solicitations does not alter the fact that the offers were apparently open to Virginia residents, and indeed, to anyone without geographical restrictions. Nor is it significant that the suit does not arise out of Harris's solicitations.

**33.** This question assumes particular significance, as noted *supra* note 30, when the reach of the long-arm is extended by the extraordinary reach of the Internet.

**34.** Bochan's sworn affidavits stating that the La Fontaines and Harris were aware that he is a Virginia resident are essentially unrefuted. Harris does not deny such knowledge, and the La Fontaines equivocal contention that they had no "direct" knowledge that Bochan was located in Virginia is unconvincing given the omission of any statements that they did not know, whether directly or indirectly, that he lived in Virginia.

challenged communication would be felt in Virginia). Thus, the constitutional prong of the inquiry is satisfied as to all defendants.

### IV.

Based on the affidavits before the Court at this time, Bochan has made a *prima facie* case for jurisdiction over all defendants.[35] Thus, defendants' motions to dismiss must be denied.

An appropriate Order has issued.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

---

**35.** Of course, the burden of proof at trial on this ultimately rests on Bochan. Should the facts turn out to be other than as presented in the current record, Bochan may ultimately be unable to carry his burden on this issue.