Stanley YOUNG, Plaintiff,

v.

**NEW HAVEN ADVOCATE,
et al., Defendants.**

No. 2:00CV00086.

United States District Court,
W.D. Virginia,
Big Stone Gap Division.

Aug. 10, 2001.

Robert Stuart Collins, Adkins, Elkins & Hunnicutt, P.C., Robert Stuart Collins, Fleming & Collins, P.C., Norton, VA, for Plaintiff.

Frederick Wilson Chockley, Bruce W. Sanford, Robert D. Lystad, Baker & Hostetler, Washington, DC, Wade W. Massie, Penn, Stuart & Eskridge, Abingdon, VA, Stephanie S. Abrutyn, New York City, James N. L. Humphreys, Kingsport, TN, James Lucas Humphreys, Hunter, Smith & Davis, Kingsport, TN, Gregory D'Auria, Karla A. Turekian, Attorney General's Office, Hartford, CT, Daniel Robeert Bieger, Copeland, Molinary & Bieger, P.C., Abingdon, VA, Jay Ward Brown, Levine, Sullivan & Koch, L.L.P., Washington, DC, Alan Neigher, Byelas & Neigher, Westport, CT, for Defendants.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, Senior District Judge.

## I. INTRODUCTION

The plaintiff, Stanley Young, the warden of Wallens Ridge State Prison, ("Wallens Ridge"), in Big Stone Gap, Virginia, initiated this action alleging defamation against the defendants, *The New Haven Advocate* and *The Hartford Courant,* along with an individual editor and columnist for each newspaper, based on diversity of citizenship.[1] Asserting a lack of personal jurisdiction, each of the defendants moved to dismiss the plaintiff's complaint pursuant to Federal Rules of Civil Procedure 12(b)(2).

The controversy here centers around several news articles written and published by the defendants regarding the controversial policy of sending Connecticut prisoners to Virginia prisons and the existence of Civil War memorabilia located in Young's prison office. Wallens Ridge received and housed certain prisoners transferred by the State of Connecticut to Virginia.

Young alleges that the defendants circulated articles defaming him through Internet websites maintained by each of the defendant newspapers. Further, Young argues that Virginia residents could access the Internet sites and the defamatory articles published by the defendants in this case. Therefore, the plaintiff argues that sufficient contacts exist to establish personal jurisdiction over the defendants.

The defendants, however, claim that the maintenance of Internet websites which are accessible by Virginia residents standing alone is insufficient contact with the forum state for this court to exercise personal jurisdiction. As set forth in the rea-

---

1. This court has granted voluntary dismissals of numerous other defendants in this action.

soning below, this court holds that the exercise of personal jurisdiction over the defendants in this case is proper.

## II. STATEMENT OF FACTS

In 1999, the State of Connecticut implemented a policy whereby it began transferring inmates from its facilities to correctional facilities located in Virginia. (Defendants' Memorandum of Points and Authorities at 2.) Specifically, Wallens Ridge, a "super-max" prison, was among the Virginia facilities which began housing certain Connecticut inmates. (*Id.*) For various reasons, Connecticut's policy of transferring prisoners from its correctional system to out-of-state prisons provoked public debate and led to demonstrations. (*Id.*) As a direct result of the controversial policy of transferring prisoners to Virginia and the subsequent public demonstrations, several news organizations began following the story and reported on the issue. (*Id.*) *The New Haven Advocate* and *The Hartford Courant,* both Connecticut-based newspapers, published news articles concerning the transfer of Connecticut prisoners to Virginia. (*Id.*) The present controversy arose as a direct result of such articles published by the defendants.

Young alleges that defendants, *The New Haven Advocate,* along with its editor, Gail Thompson, and a reporter, Camille Jackson, maliciously composed and published articles which conveyed to the community at large that Young was a racist who advocates and tolerates racism and abuse of inmates by the correctional officers under his control. (Plaintiff's complaint at 4, ¶ 7.) Young also alleges that *The New Haven Advocate* circulated these defamatory articles by means of mass communication within the State of Connecticut and throughout the world on the newspaper's Internet website. (*Id.* at 3, ¶¶ 3, 6.)

Young also alleges that *The Hartford Courant* along with its editor, Brian Too-

lan, and a reporter, Amy Pagnozzi, composed and published articles which conveyed to the community at large that Young was a racist who advocates and tolerates racism and abuse of inmates by the correctional officers under his control. (*Id.* at 17–18, ¶ 7.) Young alleges that *The Hartford Courant* circulated these defamatory articles by means of mass communication within the State of Connecticut and throughout the world on the newspaper's Internet website. (Plaintiff's complaint at 16–17, ¶¶ 3, 6.) Moreover, as a direct result of such publications by the defendants, Young claims that he suffered significant harm to his reputation in Virginia. (Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss at 3.)

Subsequently, the defendants collectively moved the court to dismiss Young's action for lack of personal jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(2). (Defendants' Memorandum of Points and Authorities at 1.) In support of these motions, the defendants contend that Young's complaint lacks assertions which establish personal jurisdiction and that jurisdiction cannot be maintained against them because they lack the necessary contacts with Virginia. (*Id.* at 4.)

In particular, *The New Haven Advocate,* a weekly newspaper published and distributed in New Haven, Connecticut, and the surrounding area, does not dispute the fact that it published an article which alluded to the plaintiff on March 30, 2000. (Defendants' Memorandum of Points and Authorities at 2; Declaration of Gail Thompson at ¶ 9.) Gail Thompson is the publisher of *The New Haven Advocate.* (*Id.*) Camille Jackson, a reporter for *The New Haven Advocate,* wrote the article, which described a lawsuit filed by Connecticut inmates to compel the removal of Civil War memorabilia from Young's office. (Defendants'

Memorandum of Points and Authorities at 2; Declaration of Camille Jackson at ¶ 7.) During the course of preparing this article, Jackson conducted a telephone interview with a spokesman for the Virginia Department of Corrections. (Defendants' Memorandum of Points and Authorities at 3; Declaration of Camille Jackson at ¶ 8.)

*The Hartford Courant,* a daily newspaper published and distributed primarily in Hartford, Connecticut, and the surrounding region with some of its content published on the Internet, published three news columns concerning the policy of transferring Connecticut inmates to Virginia correctional facilities. (Defendants' Memorandum of Points and Authorities at 2; Declaration of Brian Toolan ¶¶ 8, 9.) Brian Toolan is the editor of *The Hartford Courant.* (Declaration of Brian Toolan ¶ 9.) Amy Pagnozzi, a reporter for *The Hartford Courant,* wrote the three articles entitled "Prison Policy Cost A Life, But Goes On," "Treatment of Inmates an Outrage," and "Any Time is Bad Time in Virginia." (Declaration of Amy Pagnozzi ¶¶ 2,7.) In preparing the articles, Pagnozzi conducted a telephone interview with a spokesman for the Virginia Department of Corrections. (Defendants' Memorandum of Points and Authorities at 3; Declaration of Amy Pagnozzi ¶ 8.) The defendants argue that their contacts with the Commonwealth of Virginia are insufficient for this court to properly exercise personal jurisdiction over them under Virginia's long-arm statute. (Reply Brief on Behalf of *The Hartford Courant,* Brian Toolan, and Amy Pagnozzi Concerning Their Motion to Dismiss For Lack of Personal Jurisdiction at 2, 5.)

In support of this contention, the defendants argue that none of the writing, reporting or editing of the articles occurred in Virginia. (*Id.*) Further, the defendants argue that none of the defendants operates an office in Virginia, has a bank account in Virginia or solicits any business or engages in any persistent course of conduct in Virginia. (*Id.* at 3.) The defendants also contend that personal jurisdiction cannot be properly maintained by this court as all of the allegedly defamatory articles were prepared and published for a Connecticut audience. (*Id.*) More specifically, the defendants argue that maintenance of an Internet website that is accessible to Virginia residents twenty-four hours a day should not subject them to personal jurisdiction nationwide. (*Id.* at 1.)

On the other hand, Young argues that the maintenance of these Internet websites by which Virginia residents could access the alleged defamatory articles is sufficient contact for this court to properly exercise personal jurisdiction under Virginia's long-arm statute. *See* Va.Code Ann. § 8.01–328.1(A)(4) (Michie 2000). (Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss at 4.) More specifically, Young argues that the maintenance of these websites constitutes regularly doing or soliciting business within the Commonwealth of Virginia, and the posting of articles on these websites also constitutes a persistent course of conduct by the defendants. (Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss at 5–6.) Hence, Young argues that this court can exercise personal jurisdiction over the defendants under § 8.01–328.1(A)(4) of Virginia's long-arm statute.

### III. STANDARD OF REVIEW

■■■■ In the present controversy, all of the defendants have filed a Rule 12(b)(2) motion to challenge this court's exercise of personal jurisdiction over them. Fed. R.Civ.P. 12(b)(2). Initially, the plaintiff's burden of establishing personal jurisdiction over a defendant may be established

by a prima facie showing of a sufficient jurisdictional basis. *Dowless v. Warren–Rupp Houdailles, Inc.,* 800 F.2d 1305, 1307 (4th Cir.1986). At this stage, a court must draw all reasonable inferences arising from the facts alleged in favor of the party asserting jurisdiction. *Mylan Labs. Inc. v. Akzo, N.V.,* 2 F.3d 56, 60 (4th Cir.1993); *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir.1989). When, as here, however, the exercise of personal jurisdiction is challenged through 12(b)(2) motions to dismiss with affidavits, the question becomes, "one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs,* 886 F.2d at 676. In a diversity action such as this, a federal court may exercise jurisdiction over a defendant only if: (1) the applicable state long-arm statute confers jurisdiction and (2) the exercise of jurisdiction is consistent with constitutional due process. *See e.g. Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.,* 484 U.S. 97, 102–03, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987); *Blue Ridge Bank v. Veribanc Inc.,* 755 F.2d 371, 373 (4th Cir.1985).

■ Under Virginia law, a plaintiff must first demonstrate that Virginia's long-arm statute reaches the nonresident defendant given the cause of action alleged and the nature of the defendant's Virginia-based contacts. *Bochan v. La Fontaine,* 68 F.Supp.2d 692, 697 (E.D.Va.1999) (citing *Combs,* 886 F.2d at 676). The Virginia long-arm statute provides that Virginia courts may exercise personal jurisdiction over, *inter alia,* a person, who acts directly or through an agent, as to a cause of action arising from that person's:

> (3) Causing tortious injury by an act or omission in this Commonwealth; or (4) Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other

persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth.

Va.Code Ann. § 8.01–328.1(A)(3), (4) (Michie 2000). Secondly, a plaintiff in Virginia also must establish that the exercise of personal jurisdiction over the defendant does not exceed the bounds of due process. *Bochan,* 68 F.Supp.2d at 697 (citing *Combs,* 886 F.2d at 676). In Virginia, courts may extend personal jurisdiction to the fullest extent permitted by constitutional due process. *English & Smith v. Metzger,* 901 F.2d 36, 38 (4th Cir.1990).

■ The Due Process Clause of the Fifth Amendment requires sufficient minimum contacts with a forum state such that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citing *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). To meet the minimum contacts requirement, the out-of-state individual must have purposefully directed his or her activity toward the forum state. *Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939, 945 (4th Cir.1994).

## IV. DISCUSSION

Ultimately, this case revolves around the interesting question of where acts or omissions conducted in cyberspace actually occur. Therefore, this court must first determine whether the defendants, either acting directly or through an agent, caused an injury from an act or omission within Virginia or outside of Virginia. *See* Va. Code Ann. § 8.01–328.1(A)(3), (4). If the court finds that the acts or omissions which are alleged to have caused injury occurred in Virginia, the court may exercise jurisdiction over these defendants under § 8.01–328(A)(3). If the court finds

that these acts or omissions occurred outside of Virginia, the court must then determine if the defendants regularly did or solicited business or engaged in any other persistent course of conduct, or derived substantial revenue from goods used or consumed or services rendered in Virginia. *See* Va.Code Ann. § 8.01–328(A)(4). Next, the court must determine if the exercise of personal jurisdiction in this case would exceed the limits of due process. *See Bochan,* 68 F.Supp.2d at 698.

In making his argument for this court to exercise personal jurisdiction over the defendants, the plaintiff relies largely on the decision in *TELCO,* a defamation case from the Eastern District of Virginia. *TELCO Communications v. An Apple A Day,* 977 F.Supp. 404 (E.D.Va.1997). In that case, Telco, the plaintiff, was a Virginia corporation with a subsidiary, Dial & Save, which was involved in long-distance telephone service. *Id.* at 405. Apple, the defendant, was a Missouri telemarketing corporation that claimed to be the owner of the "Dial & Save" service-mark. *Id.* Telco alleged that the defendant issued press releases on the Internet and made calls to a securities analyst in Maryland which defamed Telco. *Id.* Telco claimed that such defamatory releases and calls harmed it by depressing the price of its stock. *Id.* The defendant acknowledged that it was advertising its firm and soliciting investment banking assistance by posting the press releases. *Id.* at 406. Nonetheless, the defendant sought to dismiss the action on the basis that personal jurisdiction could not be asserted by the Virginia federal court under Virginia's long-arm statute, Va.Code Ann. §§ 8.01–328.1(A)(3) or (4), because the defendant did not conduct business in Virginia. *Id.* at 406. The defendant did not argue that the exercise of personal jurisdiction would offend notions of due process. *Id.* at 405.

The *TELCO* court, relying to a great extent on the decision in *Inset Systems, Inc. v. Instruction Set,* 937 F.Supp. 161, 165 (D.Conn.1996), held that advertising and maintaining a toll-free number on an Internet website provided a basis for exercising jurisdiction as such conduct by a nonresident defendant constituted "regularly doing or soliciting business" in Virginia. *TELCO,* 977 F.Supp. at 407. The court stated that because the nonresident defendants, "conducted their advertising and soliciting over the Internet, which could be accessed by a Virginia resident 24 hours a day, the defendants did so regularly for purposes of the long-arm statute." *Id.* Further, the court determined that because the defendants were advertising their firm and soliciting investment banking assistance in posting the press releases, the defendants were in fact conducting business through the Internet in Virginia. *Id.*

The *TELCO* court also relied on the decision in *First American First v. National Association of Bank Women,* 802 F.2d 1511 (4th Cir.1986), to hold that the defendant's acts or omissions actually occurred in Virginia. The *First American* decision dealt with libelous letters directed at the plaintiffs who were located in Virginia; therefore, the court held that the primary and most devastating effects from such letters would be felt in Virginia. *First American First,* 802 F.2d at 1517. The *TELCO* court held that the use of a computer as opposed to paper letters did not distinguish the *First American First* defendants from the defendants in *TELCO.* *TELCO,* 977 F.Supp. at 407. Furthermore, the *TELCO* court specifically held that "defamation, like libel, occurs wherever the offensive material is circulated or distributed." *Id.* at 408.

The plaintiff also relies on the decision in *Bochan v. La Fontaine,* 68 F.Supp.2d

692 (E.D.Va.1999). In *Bochan,* the plaintiff criticized, often by means of the Internet, JFK conspiracy theories set forth in a book authored by two of the defendants, the La Fontaines. *Id.* at 695. In response to some of the plaintiff's Internet postings regarding their book, the defendants posted allegedly defamatory statements concerning the plaintiff on the Internet. *Id.* at 695–696. The plaintiff instituted an action against the defendants in the Virginia court alleging defamation and intentional infliction of emotional distress. *Id.* at 696. The defendants moved to dismiss for lack of personal jurisdiction.

In support of their motion, the defendants argued that they lacked the necessary connections or contacts with Virginia. *Id.* at 696–697. For example, the defendants argued that they derived no revenue from Virginia, did not have their own website, did not conduct commercial activity over the Internet, and accessed the Internet through a California-based Internet service provider as opposed to a Virginia-based service provider. *Id.* at 696–697.

One of the defendants in *Bochan,* Harris, also claimed that he had no connections or contacts with Virginia in that he did not use a Virginia-based Internet service provider to post any statements, and he did not direct his postings to any Virginia resident. *Id.* at 697. In addition, Harris argued that his website directly stated that his corporation sells computers only in New Mexico and that his corporation had never sold any computers to anyone in Virginia. *Id.* at 697.

Bochan responded to the defendants' motion to dismiss for lack of personal jurisdiction by arguing that the La Fontaines posted their remarks by utilizing America Online, ("AOL"), a Virginia-based company, and that they also had advertised, promoted and sold their book in Virginia. *Id.* Bochan also argued that Harris used his website to conduct business and that his website was interactive and contained contact information and advertisements, as well as being accessible to Virginia residents 24 hours a day. *Id.* Bochan also contended that all of the defendants knew that he resided in Virginia and that the harm to his reputation and the resulting emotional distress would be suffered in Virginia. *Id.*

The court held that personal jurisdiction could be asserted over the La Fontaines consistent with the Virginia long-arm statute because they had utilized a Virginia-based Internet service provider to place their alleged defamatory remarks on the Internet, and this amounted to a tortious act committed within the Commonwealth of Virginia. *Id.* at 699. As for Harris, the court also held that it could assert personal jurisdiction over him even though he did not use a Virginia-based Internet service provider to publish his remarks. *Id.* at 702. The court reasoned that because Harris solicited patronage for his computer business through an interactive website which was accessible in Virginia, he regularly did or solicited business in Virginia or engaged in a persistent course of conduct in Virginia for the purposes of the long-arm statute. *Id.* at 702. Further, the court noted that the fact that all of the defendants knew that the plaintiff was a citizen of Virginia and that the effects of their conduct would be felt in Virginia, the due process requirements for the exercise of personal jurisdiction were satisfied, as the defendants could have reasonably foreseen being haled into court in Virginia as a consequence of their actions. *Id.* at 702.

The Supreme Court's decision in *Keeton v. Hustler Magazine, Inc., et al,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), also lends support to Young's argument that this court should exercise jurisdiction over the defendants. Initially, *Keeton,* the

plaintiff, brought suit in Ohio alleging libel; however, the statute of limitations barred her action in Ohio. Thus, the plaintiff filed suit in New Hampshire. *Id.* at 772, 104 S.Ct. 1473. The plaintiff was a magazine editor who resided in New York. Hustler Magazine, Inc., the defendant, was incorporated in Ohio with its principal place of business in California. The defendant circulated approximately 10,000 to 15,000 copies of *Hustler* magazine in New Hampshire each month. Keeton claimed that she was libeled in five separate issues of *Hustler* magazine. *Id.*

In reversing the decision of the lower courts, the Supreme Court concluded that the New Hampshire court could properly assert personal jurisdiction over the defendant publisher without violating the requirements of constitutional due process. The Supreme Court held that the defendant's circulation of its magazine throughout the state of New Hampshire was not "random, isolated, or fortuitous." *Id.* at 774, 104 S.Ct. 1473. Therefore, the defendant's contacts with the state was sufficient to confer jurisdiction upon New Hampshire courts. The *Keeton* court determined that the "regular circulation of magazines in the forum State is sufficient to support an assertion of jurisdiction in a libel action based on the contents of the magazine." *Id.* at 773, 104 S.Ct. 1473. Ultimately, the Supreme Court held that "[t]he tort of libel is generally held to occur wherever the offending material is circulated." *Id.* at 777, 104 S.Ct. 1473. Therefore, it was entirely proper for New Hampshire to exercise personal jurisdiction over the defendants. The Court also determined that the plaintiff's residence played a vital role in determining whether or not to entertain a suit against the defendant in a certain forum. *Id.* at 780, 104 S.Ct. 1473. The court believed that the defendant's activities, if focused on the plaintiff's residence, may give rise to the jurisdiction. *Id.*

Young also relies on the decision rendered in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). In *Calder,* the plaintiff, Shirley Jones, initiated a defamation action against employees of the *National Enquirer* in federal court in California. The *Enquirer,* incorporated in Florida, where all of the defendants resided, had its largest circulation in California. *Id.* at 785–786, 104 S.Ct. 1482. In finding proper jurisdiction in California, the *Calder* court focused on the intentional actions of the writers. The Court concluded that the defendants aimed their activities at California as the defendants knew their article would cause substantial harm or injury to the plaintiff in California. *Id.* at 788–90, 104 S.Ct. 1482.

The defendants distinguish the application of these cases and rely on another line of cases involving defamatory materials published on Internet websites. The defendants cite numerous decisions set forth in other jurisdictions. In particular, the defendants rely on the decision set forth in *Schnapp v. McBride,* 64 F.Supp.2d 608 (E.D.La.1998). Similar to the present case, the *Schnapp* case originated from the publication and circulation of a news article in one state concerning activities occurring in another state. The plaintiff, a New Orleans police officer, sued *The Milwaukee Journal Sentinel* and one of its reporters for a statement published in the newspaper alleging that the officer used a racial slur while on duty. In rendering its decision, the *Schnapp* court considered such factors as the newspaper having a limited number of subscribers within the state, that it paid no taxes in Louisiana, that it was not listed in any Louisiana phone book, and that it did not advertise in the state of Louisiana. *Id.* at 611–612. In determining whether the exercise of personal jurisdiction was proper in the *Schnapp* case, the court also examined *The Milwaukee Journal Sentinel's* use of an

Internet website to post news articles. The newspaper published and circulated the article concerning the New Orleans police officer on its Internet website. *Id.* at 611. The court held that merely posting information on a website was insufficient to confer jurisdiction in a foreign forum. *Id.* at 611. The court concluded that the plaintiff was not the focal point of the news article which described the policing efforts of other New Orleans police officers. *Id.* Ultimately, the court determined that personal jurisdiction was not proper in Louisiana under Louisiana's long-arm statute or constitutional due process.

The defendants also rely on the decision set forth in *Roche v. Worldwide Media, Inc.*, 90 F.Supp.2d 714 (E.D.Va.2000). In *Roche*, the plaintiff, a citizen of Virginia, claimed that he reserved a specific Internet domain name. The defendant, Worldwide, was a citizen of Florida who owned a domain name identical to the one reserved by the plaintiff. *Id.* at 715. The plaintiff checked the site he reserved to find pornographic materials being maintained by the defendant. *Id.* at 716. Thus, Roche brought suit alleging fraud, negligent misrepresentation and intentional infliction of emotional distress. The defendant claimed that jurisdiction was not proper as it did not sell products or advertise in Virginia. *Id.* at 718. The plaintiff argued that the defendant's use of e-mail and credit card solicitation on the Internet was sufficient to confer jurisdiction over the defendant. *Id.* To resolve the conflict, the *Roche* court utilized the "sliding scale" analysis as set forth in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119

(W.D.Pa.1997). *Roche*, 90 F.Supp.2d at 718.

■ *Zippo's* "sliding scale" analysis characterizes Internet websites on a continuum from active to passive. *Id.* at 717–718 (citing *Zippo*, 952 F.Supp. at 1124). Utilizing this "sliding scale," the *Roche* court considered the exercise of personal jurisdiction by examining the level of interactivity and commercial nature of the exchange of information on the Internet website. *Roche*, 90 F.Supp.2d at 718. The court in *Roche* held that the defendant did nothing more than place information on an Internet website knowing that someone in Virginia might access the site. Therefore, the court characterized the site as passive and held that jurisdiction over the defendant in that case was not proper. *Id.* In addition, the *Roche* court refused to extend traditional notions of fairness and justice to meet the indeterminable boundaries prescribed by the Internet.[2]

■ Regarding the question of where acts or omissions conducted in cyberspace actually occur, this court, based on the above cases, must acknowledge that the law in the area of personal jurisdiction based upon an Internet presence is still evolving. As illustrated above, both parties to this action have cited numerous cases to support their arguments. Nonetheless, as stated above, the basic questions before the court are: (1) does the Virginia long-arm statute allow for the exercise of personal jurisdiction over the defendants? and (2) if so, would the exercise of jurisdiction violate the defendants' due process rights?

The defendants argue that this court cannot properly exercise jurisdiction over

---

**2.** In refusing to exercise personal jurisdiction based upon the presence of an Internet website, the *Roche* court stated, "[g]iven the indefinable and infinite nature of the Internet, and the accessibility of the World Wide Web to anyone with a laptop computer and a telephone line, such a finding would not only be unconstitutional, but egregiously impractical for purposes of judicial economy."

them under § 8.01–328(A)(3) of Virginia's long-arm statute. The defendants argue that all of their articles were prepared and published in Connecticut for a Connecticut audience. Further, the defendants argue that none of the writing, reporting or editing of the articles occurred in Virginia. Some of the defendants concede that they made limited telephone contacts with individuals in Virginia, but they assert that they did not visit Virginia while preparing the articles for publication. Therefore, the defendants contend that their activities do not constitute an act or omission within Virginia sufficient to confer jurisdiction under § 8.01–328(A)(3).

While the defendants disagree with *TELCO's* expansive reading of § 8.01–328(A)(3), this court finds the decision in *TELCO* to be instructive. In *TELCO,* the court relied on the decision in *First American First* where the court determined that the primary and most devastating effects of mailing libelous letters directed at the Virginia plaintiffs would be experienced in Virginia. *Id.* at 407 (citing *First American First,* 802 F.2d at 1517). The *TELCO* court refused to distinguish between mailing paper letters and the use of a computer with access to the Internet to read information. *Id.* at 407. Specifically, the *TELCO* court held, "defamation, like libel, occurs wherever the offensive material is circulated or distributed." *Id.* at 408.

This court agrees with *TELCO* in that information placed on an Internet website should be subjected to multistate jurisdiction. In the instant case, harm to Young's reputation, if any, occurred primarily in Virginia, as he is a resident of Virginia. The articles published on the Connecticut newspapers' websites were focused on the prison system in Virginia where Young was employed as a warden. The articles mentioned Young or at the very least alluded to Young. The defendants argue that in *TELCO,* unlike the case at hand,

the allegedly defamatory statements were posted on Virginia-based servers. *Id.* at 407. This may be true; however, the defendants activities on the Internet, which were ultimately accessed in Virginia, were not "random, isolated, or fortuitous." *Keeton,* 465 U.S. at 773, 104 S.Ct. 1473. Thus, this court concludes that the defendants by posting allegedly defamatory articles on Internet websites accessible twenty-four hours a day in Virginia, conducted an act or omission within Virginia sufficient for this court to confer jurisdiction over them in this case.

■  The defendants contend that, even if the Virginia long-arm statute provides for the exercise of jurisdiction, the exercise of personal jurisdiction over them by this court would violate their constitutional due process rights because they lack the necessary minimum contacts with the Commonwealth of Virginia. The defendants argue that, unlike the defendants in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804, they did not intentionally aim their activities toward Young, a Virginia resident. However, this court disagrees with the defendants. Each of the articles published on the newspapers' Internet websites characterized the conditions of the Virginia correctional system, alluded to the Virginia plaintiff or described the plaintiff's office which was located in Virginia. The defendants were all well aware of the fact that the plaintiff was employed as a warden within the Virginia correctional system and resided in Virginia. Therefore, the defendants also should have been aware that any harm suffered by Young from the circulation of these articles on the Internet would primarily occur in Virginia. *See Calder v. Jones,* 465 U.S. at 788–90, 104 S.Ct. 1482.

Relying on the decision in *Roche,* the defendants also argue that it would be unfair to subject them to worldwide juris-

diction simply because they placed information on the Internet. See *Roche*, 90 F.Supp.2d 714. Again, this court disagrees. The defendants are all involved in some form or fashion with the news media. Essentially, information is the product offered to the public by these defendants. When such information is posted on the Internet, the product is offered to a worldwide audience, as the use of the Internet defies all geographic boundaries. For example, a person sitting at a computer in rural Southwest Virginia can readily access information across the world without ever leaving his or her chair. Equally true, a reader across the world can access information from and about rural Southwest Virginia without ever leaving his or her chair. Thus, a newspaper article published and circulated on the Internet can essentially be physically "present" in different locations at one time and subjected to multistate jurisdiction.

This court finds instructive a recent decision involving trademark infringement set forth in *Christian Science Board of Directors of the First Church of Christ v. Nolan*, 259 F.3d 209 (4th Cir.2001). In that case, the U.S. Court of Appeals for the Fourth Circuit affirmed a decision previously rendered by a North Carolina district court holding that it could properly exercise personal jurisdiction over the *Nolan* defendants. The First Church of Christ, Scientist, is a religious organization based in Massachusetts with several branches located in different parts of the world that provides a variety of products for its members. The plaintiffs, members of the board of directors of the First Church of Christ, Scientist, owned the trademarks displayed on the Church's products. *Nolan*, 259 F.3d 209, 212. The defendants, Nolen and Robinson, were dissidents from the Christian Science Church. Nolen, a resident of Arizona, founded the University of Christian Science and established an electronic campus on the Inter-

net to provide and exchange educational information about the teachings of the church's founder. While Nolen, provided the educational content contained on the website, Robinson, a resident of North Carolina, provided technical assistance to Nolen by securing the domain name and posting information on the website. *Id.*

In *Nolan*, the fundamental question on appeal, and the question most relevant to this court, was whether the defendants' contacts with the forum state were sufficient to support the district court's exercise of personal jurisdiction. *Id.* at 213–14. The court determined that the defendants' contacts with North Carolina were insufficient for the court to exercise general jurisdiction over them. *Id.* at 215–16. Thus, the court centered its analysis around the exercise of specific jurisdiction and concerns of constitutional due process. In doing so, the Court of Appeals examined three factors set forth in *Burger King* to determine whether the exercise of specific jurisdiction was proper: (1) to what extent did the defendants "purposely avail" themselves of the privileges of conducting activities in the forum state thereby invoking the benefits and protections of the laws of that state; (2) whether or not the present claim arose out of activities related to the forum state; and (3) was the exercise of personal jurisdiction constitutionally "reasonable." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 476–77, 105 S.Ct. 2174, 85 L.Ed.2d 528(1985)).

The defendants argued that the North Carolina court could not properly exercise jurisdiction over them because their activities were not sufficient to satisfy the "purposeful availment" requirement. *Id.* at 216–17. In support of this contention, the defendants argued that Robinson simply volunteered to provide technical assistance to Nolen without being compensated or solicited. The court determined that Rob-

inson's invitation to maintain the website arose from the friendship between the two defendants along with their desire to disseminate religious information, products and services. *Id.* The court in *Nolan* determined that both defendants deliberately entered into a collaborative agreement "well aware that potentially tortious content [they] created would be physically uploaded by a North Carolina resident working on a computer in North Carolina." *Id.* Thus, the court concluded that the defendants' acts were neither fortuitous nor unintentional as to defeat the exercise of personal jurisdiction. Turning to the second inquiry, the court determined that no dispute existed regarding the origination of the claim. Finally, the court analyzed the issue of whether or not it was reasonable to exercise personal jurisdiction. In doing so, the court considered such factors as: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive policies." *Id.* (quoting *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174).

Ultimately, the court determined that defending a suit in North Carolina was inconvenient for Nolen, but did not offend notions of due process. *Id.* at 218. Moreover, the court determined that defending the suit in North Carolina reduced the burden on Robinson, Nolen's co-defendant. *Id.* The court also held that North Carolina was a logical forum for the suit as it had an interest in deterring trademark infringement accomplished "by the postings of allegedly infringing materials by a North Carolina resident to a website accessible through a North Carolina-based domain." *Id.* Thus, the court concluded that the district court's exercise of specific

personal jurisdiction over the defendants did not offend the requirements of due process.

This decision also supports the conclusion that the exercise of personal jurisdiction over the defendants in the case at hand does not offend traditional notions of due process. This court determines that the facts of this case, as set forth above, are sufficient to satisfy the first condition of "purposeful availment." The defendants published and circulated articles on their websites concerning the ongoing controversy surrounding the policy of sending Connecticut prisoners to correctional facilities in Virginia. The plaintiff was a warden in the Virginia correctional system. The allegedly defamatory news articles originated from the controversial policy and the plaintiff's relationship to the Virginia correctional system. Like the defendants in *Nolan*, the present defendants were well aware that any potentially tortious content published and circulated on their websites could be physically uploaded by a Virginia resident working on a Virginia computer. Thus, this court concludes that the defendants' acts were not fortuitous or unintentional. There is also no dispute in this case that the posting of news articles on the Internet gave rise to the present litigation. Thus, the second condition of *Nolan* is also satisfied. In turning to the question of constitutional reasonableness, this court concludes that the exercise of personal jurisdiction is proper in this case. Similar to the defendants in *Nolan*, defending a suit in a Virginia court may inconvenience the Connecticut defendants, but it does not violate traditional notions of due process. Moreover, Virginia has a significant interest in deterring the posting of defamatory materials concerning one of its citizens, especially a citizen employed within the Virginia correctional system, on the Internet. Thus, this court can properly exercise per-

sonal jurisdiction without offending traditional notions of constitutional due process.

## V. CONCLUSION

This court concludes that the exercise of personal jurisdiction over these defendants is proper under Code of Virginia § 8.01–328(A)(3), as the defendants' Connecticut-based Internet activities constituted an act leading to an injury to the plaintiff in Virginia. Likewise, this court holds that the defendants' Internet activities are sufficient to satisfy the requirements of constitutional due process. Thus, the defendants' motion to dismiss for lack of personal jurisdiction is denied as to all defendants. An appropriate order will follow.